**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE ABERT, | ) | |
| | ) | Civil Action No. 12 - 393 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Mark R. Hornak |
| | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| REHABCARE CROUP INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | ECF Nos. 20 & 28 |
| | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

It is respectfully recommended that the Motion to Dismiss filed by Defendants THI of Pennsylvania at Greenery of Canonsburg, LLC and Fundamental Long Term Care Holdings, LLC (ECF No. 20) be granted in part and denied in part, as more fully set forth below.  It is further recommended that the Motion to Dismiss filed by Defendant Rehabcare Group, Inc. (ECF No. 28) be granted in part and denied in part, as more fully set forth below.

## II.    REPORT

In this employment discrimination case, Plaintiff has brought claims alleging sex-based discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq.*, for constructive discharge and failure to rehire (Count I)*,* a hostile work environment (Count II), and for retaliation (Count III).  Plaintiff also asserts pendant state law claims for wrongful discharge of a victim of a crime pursuant to the Pennsylvania Crime Victims Employment Protection Act, 18 Pa. Cons. Stat. Ann. §4957 (Count IV), intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI),

intentional interference with a business relationship against Greenery (Count VII), and wrongful discharge in violation of public policy (Count VIII).

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343. In addition, this Court has jurisdiction over the pendant state law claims pursuant to 28 U.S.C. §1367(a). Venue lies in this district pursuant to 28 U.S.C. §1391(b), as the acts giving rise to this lawsuit allegedly occurred in this district.

All of the Defendants have moved to dismiss Counts I through III of the Complaint arguing that those claims are time-barred, and that Plaintiff fails to state a plausible claim for discriminatory failure to rehire in Count I. In addition, Defendants THI of Pennsylvania at Greenery of Canonsburg[1] ("Greenery") and Fundamental Long Term Care Holdings, LLC ("Fundamental") have moved, in the alternative, for summary judgment on Counts I through III. All Defendants have moved to dismiss Counts V and VI arguing that those claims are preempted by the Pennsylvania Workers' Compensation Act, 77 P.S. §1 *et seq.* In the alternative, Defendant Rehabcare Group, Inc. ("Rehab") submits that Plaintiff has failed to state a plausible claim in Count V. Defendant Rehab has moved to dismiss Count IV for failure to state a plausible claim under Rule 12(b)(6). Finally, Defendant Rehab has moved to dismiss Count VIII arguing that Plaintiff's wrongful discharge claim is preempted by the Crime Victims Employment Protection Act.[2] The Court will address each of these arguments below in turn.

---

[1] The Complaint incorrectly identifies Defendant THI of Pennsylvania at Greenery of Canonsburg, LLC, doing business as Greenery Specialty Care Center of Canonsburg, as "Greenery Specialty Care Center (of Canonsburg), a fictitious name for Greenery Rehabilitation and Skilled Nursing Center of Meadowlands." *See* Defs. Mot. to Dismiss at 1 n. 1, ECF No. 20 at 1.

[2] Count VII is only asserted against Greenery, and Greenery has not moved to dismiss Count VII.

## A.  FACTUAL BACKGROUND[3] & PROCEDURAL HISTORY

Plaintiff's claims derive from her employment as an occupational therapist at a long-term care facility in Canonsburg, Pennsylvania. On May 29, 2007, Rehab hired Julie Abert ("Plaintiff"), formally known as Julie McPeake, to work as an occupational therapist. (Compl. at ¶¶6,17, ECF No. 1.) On or around that date, Rehab assigned Plaintiff to work at a long term facility known as Greenery Specialty Care Center of Canonsburg. (Compl. at ¶17.) Greenery is operated by Fundamental Long Term Care Holdings LLC. (Compl. at ¶13.) Rehab also employed Plaintiff's husband at the time, Brian McPeake ("McPeake"), as an assistant physical therapist at Greenery beginning in April of 2007. (Compl. at ¶26, 27.) Both Plaintiff and McPeake reported to the same supervisor, Trish Miller, whose office was located at another Rehab office in Wexford, PA. (Compl. at ¶29.)

Before Plaintiff accepted a position as an occupational therapist with Rehab, she questioned Rehab to be sure that working at the same facility as her spouse was not a problem and was told that it would not be an issue. (Compl. at ¶¶30, 31.)  After Plaintiff accepted employment with Rehab and began work at the Greenery, Rehab promoted McPeake to the position of Program Director of Rehabilitation where he began to manage the occupational, physical, and speech therapist departments. (Compl. at ¶32.) Since Miller, Plaintiff's supervisor, was not physically present at the Greenery each day, McPeake managed the employees that staffed the rehabilitation services department and gave assignments to Plaintiff. (Compl. at ¶34.)

Around September of 2009, Plaintiff learned that McPeake was having an affair with LeaAnne Deems, Greenery's Assistant Director of Nursing, although she did not immediately

---

[3] For purposes of the motions to dismiss, the factual allegations in the Complaint are assumed to be true.

acknowledge it to anyone. (Compl. at ¶¶35, 36.) Around this time, McPeake also became friendly with Greenery's head administrator, Drew Leroy, who socialized with McPeake and Deems outside of work. (Compl. at ¶37.) In December of 2009, after Plaintiff confronted them about their affair, McPeake and Deems officially disclosed their affair to their direct supervisors at Rehab and Greenery and began interacting in an openly romantic manner at work; McPeake also began assigning Plaintiff to work sites distant from her home. (Compl. at ¶¶39, 42, 45.) Plaintiff went to Jennifer Beck in Rehab's Human Resources department, to speak about McPeake's affair with Deems, McPeake's assignments of Plaintiff to distant work sites, and McPeake's other actions towards Plaintiff at work. (Compl. at ¶40.)

Later, Trish Miller held a meeting with employees of Rehab to "discuss 'Brian and Julie's unfortunate situation.'" (Compl. at ¶47.) Plaintiff attended the meeting, feeling "humiliated and embarrassed." (Compl. at ¶¶47,48.) After the meeting, McPeake began to harass and threaten Plaintiff and her work reputation. (Compl. at ¶49.) Plaintiff again reported McPeake's conduct to Jennifer Beck, informing her that McPeake falsely accused her of stealing things and deleting things from his computer, refused to answer Plaintiff's questions, told co-workers that she was "'crazy,'" took items from her purse, threw papers at her, shoved a chair at her, and used foul language towards her. (Compl. at ¶49.)

During the time that Plaintiff and McPeake's relationship with one another deteriorated, McPeake's conduct towards Plaintiff began to turn violent. (Compl. at ¶¶50, 51.) McPeake's violent behavior concluded on March 28, 2010 when McPeake severely beat Plaintiff, causing a zygomatic fracture of her skull along with many bruises and contusions. (Compl. at ¶56.) North Stranebane police officers arrested McPeake that night and charged him with simple assault and

harassment; McPeake was then released from Washington County Jail on a $25,000 bond.[4] (Compl. at ¶¶57, 73.) Plaintiff secured an emergency Protection from Abuse (PFA) order that same night. (Compl. at ¶¶58.)

The following day, on March 29, 2010, Plaintiff called Trish Miller to inform her that she would be late for work. (Compl. at ¶59.) Plaintiff assumed that Miller knew her tardiness was court related since McPeake was in jail and Miller inquired as to whether Plaintiff would be at work at all that day. (Compl. at ¶59.) After going to court and obtaining a preliminary PFA, Plaintiff returned to work around noon on March 29th with a visibly bruised face. (Compl. at ¶60.) Plaintiff did not discuss the matter with any co-workers, despite their inquiries. (Compl. at ¶61.)   Plaintiff then learned from co-workers that a temporary occupational therapist announced she would be working at the Greenery for at least two to three more weeks or even longer. (Compl. at ¶62.) Hearing this, Plaintiff became suspicious that something was happening regarding her job and called Jennifer Beck. (Compl. at ¶63.) Beck then placed Plaintiff  on a three-way call with  Trish Miller. (Compl. at ¶64.) During that call, Plaintiff told Miller and Beck that she was late to work because McPeake assaulted her the night before and she had to go to court that morning to obtain a PFA. (Compl. at ¶65.) Miller responded that "they could not be judge and jury as to the events that had occurred with Brian[,]" and they suspended Plaintiff without pay.  Miller and Drew allowed Plaintiff to work the rest of the day because she was needed. (Compl. at ¶¶66, 72.) Plaintiff told Beck and Miller that "she was victimized by Brian and now was victimized by them." (Compl. at ¶67.) Beck and Miller responded that they could not allow Plaintiff and McPeake to be together in the same building, claiming that this was Drew

---

[4] On May 26, 2011, McPeake pled guilty to the second degree misdemeanor of simple assault. (Compl. ¶84.)

Leroy's order. (Compl. at ¶68.) Plaintiff assumed McPeake was treated similarly and removed from the facility. (Compl. at ¶70.) Additionally, Miller accused Plaintiff of "bringing her personal matters into work," even though she had refused to discuss the events of her abuse with co-workers. (Compl. at ¶71.)

On April 14, 2010, Plaintiff wrote to the head of the Human Resources Department at Rehab, Curt Davies, to report her "disagreement of being suspended without pay and asked to be immediately returned to her position," but Davies did not respond. (Compl. at ¶74.) On April 18, 2010, Miller called Plaintiff to a meeting where she told her that there were no available positions for her in the Pittsburgh area and that she could work at Rehab, but only in Maryland. (Compl. at ¶75.) Plaintiff refused to move, so she resigned from Rehab. (Compl. at ¶75.) Miller also stated that the administrator at the Greenery did not want her in the building because Plaintiff came to work with a black eye and refused to discuss it with co-workers. (Compl. at ¶76.) Plaintiff requested that she be compensated for the paid time off days that she used while she was suspended and that her suspension be removed from her records, but Miller refused. (Compl. at ¶77.)

Nearly ten months later, around February 11, 2011, Plaintiff learned that Miller and Leroy held a meeting to ask the staff of both Greenery and Rehab how they felt about allowing McPeake to return to work. (Compl. at ¶78.) Plaintiff believes that McPeake returned to work at the Greenery as a case manager over some employees' objections sometime after February 11, 2011. (Compl. at ¶¶79,80.) Neither the Greenery nor Rehab offered to rehire Plaintiff or to clear her record of the suspension and termination, or pay her for the Paid Time Off days that she lost. (Compl. at ¶81.)

Within 300 days of becoming aware that Defendants Rehab and Greenery misled her about Greenery's desire to treat McPeake and her similarly, Plaintiff filed a charge of discrimination under Title VII of the Civil Rights Act against Greenery, Fundamental, and Rehab with the Equal Opportunity Employment Commission (EEOC) on June 9, 2011.[5] (Compl. ¶85; Pl's Charge of Discrimination, ECF No. 37 at 3-11.) The EEOC issued a notice of right to sue letter on March 28, 2012 (Ex. 1 to Compl., ECF No.1-2 at 2),[6] and later that same day, Plaintiff filed her Complaint in federal court, in which she asserts claims for sex discrimination in violation of Title VII based on (1) her termination (constructive discharge) and Defendants' failure to rehire her; (2) hostile environment; and (3) retaliation. Plaintiff also asserts state law claims for (1) wrongful discharge of a victim of a crime pursuant to 18 PA. CONS. STAT. §4957, also known as the "Crime Victim's Employment Protection Act"; (2) intentional infliction of emotional distress; (3) negligent infliction of emotional distress; (4) intentional interference with a business relationship against Defendant Greenery; and (5) and wrongful discharge in violation of public policy.

On August 8, 2012, Defendants Greenery and Fundamental filed answers to Plaintiff's Complaint. (ECF Nos.16, 17.) Also on that date, Defendants Greenery and Fundamental filed a motion to dismiss Counts I, II, III, V, and VI of Plaintiff's Complaint, and moved, in the

---

[5] Defendants incorrectly state in their briefs that Plaintiff filed her charge of discrimination with the EEOC on June 21, 2011. A close examination of the EEOC documents filed by Defendants Greenery and Fundamental in support of their motion to dismiss shows that the EEOC received Plaintiff's charge of discrimination on June 9, 2011 (*see* ECF No. 37 at 3 & 9), and that the EEOC issued its Notice of Charge of Discrimination to Plaintiff's alleged employers on June 21, 2011 (*see* ECF No. 37 at 1).

[6] It appears that Plaintiff filed two charges of discrimination with the EEOC, as she attached two notice of right to sue letters to the Complaint referencing EEOC Charge Nos. 533-2011-00807 and 533-2-11-00811. The latter charge number relates to the Notice of Right to Sue Letter issued from the EEOC that is at issue in this case.

alternative, for summary judgment on Counts I, II and III, along with a brief in support of those motions. (ECF Nos. 20, 21.) On August 24, 2012, Defendant Rehab filed a motion to dismiss all claims in the Complaint, along with a brief in support of its motion. (ECF Nos. 28, 29.) On October 12, 2012, Plaintiff filed a response to each of the motions (ECF Nos. 33, 34), along with a declaration (in response to Greenery's and Fundamental's motion, in the alternative for summary judgment (see ECF No. 35-1), and an omnibus brief in opposition to Defendants' motions (ECF No. 35). On October 29, 2012, Defendants filed their respective replies to Plaintiff's omnibus brief in opposition to their motions. (ECF Nos. 38, 42.)

The motions have been fully briefed and responded to and are ripe for disposition.

## B.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993). A complaint must be dismissed for failure to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly* at 556). The Supreme Court further explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly* at 556-57). The court of appeals has expounded on this standard in light of

its decision in *Phillips v. County of Allegheny,* 515 F.3d 224 (3d Cir. 2008) (construing *Twombly*

in a civil rights context), and the Supreme Court's recent decision in *Iqbal*:

> After *Iqbal,* it is clear that conclusory or "bare-bones" allegations
> will no longer survive a motion to dismiss: "threadbare recitals of
> the elements of a cause of action, supported by mere conclusory
> statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. To prevent
> dismissal, all civil complaints must now set out "sufficient factual
> matter" to show that the claim is facially plausible. This then
> "allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged." *Id.* at 1948. The
> Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must
> show that the allegations of his or her complaints are plausible. *See
> Id.* at 1949-50; *see also Twombly,* 505 U.S. at 555, & n. 3.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). In light of *Iqbal*, the *Fowler*

court then set forth a two-prong test to be applied by the district courts in deciding motions to

dismiss for failure to state a claim. First, the district court must accept all well-pleaded facts as

true and discard any legal conclusions contained in the complaint. *Fowler,* 578 F.3d at 210-11.

Next, the court must consider whether the facts alleged in the Complaint sufficiently demonstrate

that the plaintiff has a "plausible claim for relief." *Id.* at 211. To survive a motion to dismiss, a

complaint must show an entitlement to relief through its facts. *Id.* (citing *Phillips* at 234-35).

Courts generally consider only the allegations of the complaint, attached exhibits, and

matters of public record in deciding motions to dismiss. *Pension Benefit Guar. Corp. v. White

Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted). Factual allegations

within documents described or identified in the complaint may also be considered if the

plaintiff's claims are based upon those documents. *Id.* A district court may consider these

documents without converting a motion to dismiss into a motion for summary judgment.[7] *In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).[8]

### C.    DISCUSSION

#### 1.    Plaintiff's Title VII Claims for Constructive Discharge, Hostile Work Environment, & Retaliation Are Time-Barred

In support of their motions to dismiss Plaintiff's Title VII claims for constructive

discharge (in Count I), hostile work environment (Count II), and retaliation (Count III),

Defendants submit that the statute of limitations began to run on Plaintiff's last day of

employment, which was April 18, 2010.    Thus, because Plaintiff filed her charge of

discrimination with the EEOC more than 300 days after her termination on April 18, 2010, her

Title VII claims for constructive discharge, hostile work environment and retaliation are time-

barred.  In response, Plaintiff concedes that she did not file her charge of discrimination with the

EEOC within 300 days of her last day of employment—April 18, 2010.  However, Plaintiff

---

[7] Of particular relevance here, several district courts in this circuit have held that an EEOC charge of discrimination and other related documents (e.g., right to sue letter, intake questionnaire) are public records, and therefore, the court may consider these documents without converting the motion to dismiss into a motion for summary judgment.  *Branum v. United Parcel Serv., Inc.,* 232 F.R.D. 505, 506 n. 1 (W.D.Pa. 2005) (Conti, J.) (citing *Rogan v. Giant Eagle, Inc.,* 113 F. Supp. 2d 777, 782 (W.D.Pa. 2000) (Cohill, J.); *Burkhart v. Knepper,* 310 F. Supp. 2d 734, 741-42 (W.D.Pa. 2004) (Gibson, J.); *Hercik v. Rodale, Inc.,* No. Civ.A. 03-CV-06667, 2004 WL 1175734, * 1 (E.D.Pa. May 24, 2004) (other citation omitted)); *see also Price v. Schwan's Home Serv., Inc.,* No. Civ. A. 05-220J, 2006 WL 897721, * 3 (W.D.Pa. Apr. 3, 2006) (Gibson, J.) (In deciding motion to dismiss, court could rely on PHRC complaint where defendant made it part the motion, the document was authentic, and plaintiff's claim rested upon it (citing *Steinhardt Group, Inc. v. Citicorp,* 126 F.3d 144, 145 (3d Cir. 1997))).

[8] Defendants Greenery and Fundamental have moved in the alternative for summary judgment as to Counts I, II and III.  In ruling on the pending motions, the Court finds it is not necessary to rely on any documents other than public records or those attached to the Complaint. Thus, only the legal standard for a motion to dismiss under Rule 12(b)(6) has been applied here.

contends that her charge was nonetheless timely based on either the equitable tolling doctrine or continuing violation theory, and therefore, her Title VII claims are timely.

A charging party has 300 days to file a charge with the EEOC that begins to run "after the alleged unlawful employment practice occurred" if the charging party also files a complaint with a parallel state agency.[9] 42 U.S.C. §2000e-5(e)(1). The EEOC's 300-day time limit applies whether or not the charge was first filed with the state agency or within the state agency's limitation period so long as the state has a work-share agreement in place with the EEOC. Because a work-share agreement exists in Pennsylvania between the Pennsylvania Human Relations Commission ("PHRC") and the EEOC, a charge of discrimination under Title VII will be timely filed as long as the plaintiff files the charge with the EEOC within 300 days of the allegedly discriminatory conduct. *Brennan v. Nat'l Tel. Directory Corp.*, 881 F. Supp. 986, 993 (E.D.Pa. 1995) (citing 42 U.S.C. §2000e-5(e)(1)). Generally, the imitations period begins to run from the date the adverse employment action was taken and communicated to the employee. *Del. State Coll. v. Ricks*, 449 U.S. 250, 259 (1980).

In Count I of the Complaint, Plaintiff alleges that she was constructively discharged on April 18, 2010, when she was forced to resign after she was told she could only return to work for Rehab if she moved to Maryland and she refused to do so. (Compl. ¶75.) The court of appeals for this circuit has not yet addressed when the limitations period beings to run on a constructive discharge claim under Title VII. However, several other courts of appeals have held

---

[9] The limitations period in civil rights cases serves a two-fold purpose: (1) "guaranteeing the protection of the civil rights laws to those who promptly assert their rights" and (2) to "protect employers from the burden of defending claims arising from employment decisions that are long past." *Del. State Coll. v. Ricks,* 449 U.S. 250, 256-57 (1980) (citations omitted). However, the "'primary consideration underlying statutes of limitations is that of fairness to the defendant.'" *Hart v. J.T. Baker Chem. Co.,* 598 F.2d 829, 833 (3d Cir. 1979) (quoting *Smith v. Am. President Lines, Ltd.,* 571 F.2d 102, 109 n. 12 (2d Cir. 1978)).

that a constructive discharge claim begins to accrue on the date the employee gives notice of his or her resignation. *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110-11 (9th Cir. 1998) (holding date of discharge triggers running of the statute of limitations in a constructive discharge case; when a resignation is the constructive discharge, the limitations period begins to run on the date of the employee's resignation); *Am. Airlines v. Cardoza-Rodriguez*, 133 F.3d 111, 122-23 (1st Cir. 1998) (constructive discharge—choice between early retirement with benefits or discharge without benefits, offered only to older employers—occurred, and statute of limitations began to run, when each employee accepted the early retirement offer); *Flaherty v. Metromail Corp.,* 235 F.3d 133, 138-39 (2d Cir. 2000) (agreeing with the Ninth Circuit that the date of discharge triggers the limitations period in a constructive discharge case and holding that employee's constructive discharge claim began to accrue on date she gave definite notice of her intention to retire) (citing *Draper,* 147 F.3d at 1110); *see also Young v. Nat'l Center for Health Servs. Research*, 828 F.2d 235, 238 (4th Cir.1987) (when an employer "makes the employee's job conditions so intolerable that a reasonable person would feel forced to resign, then the resignation is a constructive discharge—a distinct discriminatory 'act' for which there is a distinct cause of action.") (citations omitted).

Several judges in this district have ruled similarly. *Stremple v. Nicholson,* Civ. A. No. 01-890, 2006 WL 1744316, at *4 (W.D.Pa. June 22, 2006) (limitations period on constructive discharge claim began to run when employee gave notice of his retirement); *Graham v. Avella Area Sch. Dist.,* Civ. A. No. 02:05-cv-1344, 2006 WL 1669881, at *4 (W.D.Pa. June 14, 2006) (adopting the reasoning in *Flaherty,* court held statute of limitations began to run on constructive discharge claim on date employee notified employer of her retirement because that was the date she knew about her injury); *cf. Ilori v. Carnegie Mellon Univ.,* 742 F.Supp. 2d 734, 753

(W.D.Pa. 2010) (holding employee's constructive discharge claim was timely because both his last day of work and the date of his first letter of resignation fell within the limitations period). Based on the above authority, this Court finds that the Third Circuit would likely hold that a constructive discharge claim in a Title VII action begins to accrue on the date the employee gives notice of her resignation, because at that point, the employee would know of her injury, having been forced to resign (or retire) due to the alleged intolerable work environment.[10]

In the case at bar, Plaintiff resigned on April 18, 2010 when she was informed that her only option for returning to work with RehabCare was accepting a position at one of its facilities in Maryland. According to the Complaint, April 18, 2010 is the date when Plaintiff perceived that her job conditions were so intolerable that she felt forced to resign. (Compl. ¶85.) The Court thus finds that the statute of limitations on Plaintiff's constructive discharge claim began to run on April 18, 2010. However, she did not file her charge of discrimination with the EEOC until June 9, 2011, more than 300 days later. Therefore, unless an exception applies to toll the 300-day period, Plaintiff's constructive discharge claim is time-barred.

In Count II of the Complaint, Plaintiff alleges that she was forced to work in a hostile environment where her husband, who was also her supervisor, conducted an open affair with a female co-worker, and was openly abusive and threatening to her in an effort to eliminate her, which was known by management of RehabCare and Greenery and allowed to continue unabated for a long time, without any action to improve the situation, despite her complaints to management. (Compl. ¶¶98-102.) Based on these allegations, Defendants argue that April 18, 2010 should be the date upon which the statute of limitations begins to run for Plaintiff's hostile

---

[10] In some cases, such as this one, the notice of resignation and last day of employment will be one in the same.

work environment claim. Defendants submit that the alleged harassment occurred prior to her alleged constructive discharge on April 18, 2010, and therefore, the hostile work environment claim is time-barred, for the same reason as her constructive discharge claim. The Court agrees that if all of the alleged acts of harassment occurred on or before April 18, 2010, Plaintiff's hostile work environment claim is time-barred. Plaintiff submits, however, that the act of rehiring McPeake in February of 2011 was not a discrete act of discrimination, but rather, a part of a continuing violation, and thus, makes her hostile work environment claim timely. As explained below, this argument lacks merit.

Finally, as to her retaliation claim (Count III), Plaintiff alleges that Defendants retaliated against her for complaining about McPeake's alleged verbal and physical harassment and abuse, by suspending her after she came to work on March 29, 2010 with bruises on her face after obtaining a PFA order from court, and by subsequently terminating her on April 18, 2010. (Compl. ¶¶106-109.) Defendants argue that the retaliation claim is also time-barred because the alleged retaliatory conduct occurred on or before April 18, 2010, and therefore, that is the date on which the statute of limitations should begin to run. The Court agrees with Defendants. Because Plaintiff's charge with the EEOC was filed more than 300 days after April 18, 2010, the retaliation claim is time-barred.

The Court's conclusion that Plaintiff's claims for constructive discharge, hostile work environment and retaliation are time-barred does not end the inquiry, however, because recognized exceptions exist which may extend the 300-day limitations period. In this case,

Plaintiff asserts that two such exceptions apply: the equitable tolling doctrine and continuing violation doctrine.[11] The Court will consider each of these exceptions in turn.

### a.    Equitable Tolling Doctrine

"Equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994). The Third Circuit has recognized three different situations where application of the equitable tolling doctrine is appropriate: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *Id.* (citing *Sch. Dist. of City of Allentown v. Marshall,* 657 F.2d 16, 19-20 (3d Cir.1981)) (other citations omitted). Only the first equitable tolling situation is implicated in the case at bar.

In that regard, the Third Circuit has recognized that "cases may arise 'where the employer's own acts or omissions have lulled the plaintiff into forgoing prompt attempts to vindicate his [or her] rights.'" *Oshiver,* 38 F.3d at 1387 (citing *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 (3d Cir. 1983) (quoting *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir.1977))) (internal quotation marks omitted). Thus, in the context of employment discrimination cases, the court of appeals has held "that the equitable tolling doctrine may excuse the plaintiff's non-compliance with the statutory limitations provision at issue when it appears that (1) the defendant actively misled the plaintiff respecting the reason for the plaintiff's

---

[11] All parties appear to agree that the 300-day time limit applies to Plaintiff's charge of discrimination.

discharge, and (2) this deception caused the plaintiff's non-compliance with the limitations provision." *Id.* (citing *Meyer,* 720 F.2d at 308-09).

In support of her equitable tolling argument, Abert contends that based on Greenery's rehiring of McPeake "299 days after [her] termination on 4/18/10, the inference is clear that the ostensible sex-neutral terminations asserted by defendants was a lie." Pl.'s Mem. in Opp'n at 6-7 (ECF No. 35 at 6-7). Plaintiff submits that Defendants misled her to believe Greenery wanted both her and McPeake out of the building, which was clearly untrue since Greenery later rehired McPeake after creating a scenario where it appeared that they treated a male and female worker the same. *Id.* at 5-6. Plaintiff also reiterated these circumstances to an intake worker at the PHRC who allegedly discouraged her from filing a claim due to the seemingly equal treatment of her and McPeake. *Id.* Thus, according to Plaintiff, Defendants' act of misleading her makes her delayed charge with the EEOC subject to equitable tolling.

Defendants Greenery and Fundamental counter that the equitable tolling doctrine should not be applied here because the law of this circuit holds that a "claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong." *Oshiver,* 38 F.3d at 1386. Since Plaintiff knew of her alleged constructive discharge on 4/18/10, Greenery and Fundamental submit that she cannot save her time-barred claim by arguing that she did not know she had a cognizable claim until the Greenery hired McPeake after 2/11/11. Greenery and Fundamental further submit that Plaintiff's argument (that "the inference is clear that the ostensible sex-neutral terminations asserted by defendants was a lie") does not change the fact that her injury occurred, if at all, on 4/18/10, at which time her causes of action accrued and the limitations period began to run. Defendants' argument misses the mark, however, as they conflate the equitable tolling doctrine with the discovery rule. The court of

appeals in *Oshiver* succinctly explained the difference between the two:

> The two doctrines differ, however, with respect to the type of knowledge or cognizance that triggers their respective applications. The discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of actual injury. See Merrill, 806 F.2d at 604-05. Equitable tolling, on the other hand, keys on a plaintiff's cognizance, or imputed cognizance, of the facts supporting the plaintiff's cause of action. Underlying this difference between the discovery rule and equitable tolling is the more fundamental difference in purpose between the two rules. The purpose of the discovery rule is to determine the accrual date of a claim, for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run. Equitable tolling . . . presumes claim accrual. Equitable tolling steps in to toll, or stop, the running of the statute of limitations in light of established equitable considerations.

38 F.3d at 1390 (footnote omitted).  In the case at bar, Abert does not appear to be disputing that for purposes of the discovery rule, her constructive discharge claim began to accrue on 4/18/10.  Rather, she is contending that the running of the limitations period should be tolled because Defendants actively misled her as to the real reason for her constructive discharge.  Thus, Defendants' attempt to defeat application of equitable tolling based on the discovery rule is unavailing.

RehabCare's argument against application of the equitable tolling argument is two-fold: (1) in order for Plaintiff's charge to be timely as to her claims against it, Plaintiff must have alleged that RehabCare is a joint employer of the Greenery's employees; and (2) RehabCare did not actively mislead Plaintiff with regard to her causes of action.  As to its first argument, RehabCare submits that Abert has failed to allege any specific facts to support a joint employer finding.  The Court disagrees with this supposition.  An examination of the Complaint reveals sufficient factual allegations to suggest that joint employer status is plausible, or to at least raise questions of fact inappropriate for determination on a motion to dismiss.

In determining whether an employment relationship exists for purposes of Title VII, the courts have applied several different tests depending on the particular facts of the case. The one that appears to be applicable here was delineated by the court of appeals in *NLRB v. Browning-Ferris Industries of Pa., Inc.*, 691 F.2d 1117 (3d Cir.1982), and asks whether or not "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* at 1123 (citation omitted). District courts in this circuit "have distilled the *Browning-Ferris* joint-employer test into the following three factors: '1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; 2) day-to-day supervision of employees, including employee discipline; and 3) control of employee records, including payroll, insurance, taxes and the like.'" *Butterbaugh v. Chertoff,* 479 F.Supp. 2d 485, 492 (W.D.Pa. 2007) (quoting *Cella v. Villanova Univ*., No. 01-7181, 2003 WL 329147, *7 (E.D. Pa. Feb 12, 2003)).

The following factual allegations, taken together, suggest that RehabCare plausibly is a joint employer of Greenery's employees. Plaintiff has alleged that RehabCare provides physical therapists, occupational therapists, and speech therapists to long-term care facilities, and in particular, hired and placed Abert at Greenery on 5/29/07, where Greenery began to act as a joint employer of Abert. (Compl. ¶¶11, 17, 20.) Daily, Plaintiff reported to Greenery as her workplace at times and dates determined by Greenery, admitted patients to Greenery, and used Greenery's facilities and equipment. (*Id.* at ¶¶21-23.) Greenery had authority to remove Abert from the premises and to cause her to be suspended and terminated. (*Id.* at ¶24.) Plaintiff was required to follow Greenery's policies and procedures. (*Id.* at ¶25.) RehabCare also employed

McPeake and placed him at Greenery in April of 2007. (*Id.* at ¶26-27.) Both Abert and McPeake reported to Trish Miller, area manager of RehabCare. (*Id.* at ¶29.) Abert negotiated the conditions of her employment with RehabCare. (*Id.* at ¶30-31.) RehabCare promoted McPeake. (*Id.* at ¶32.) Miller and Beck (RehabCare HR employee) told Abert that Drew Leroy (Greenery Administrator) did not want either her or McPeake in the building. (*Id.* at ¶69.) Miller and Leroy allowed Abert to work the rest of the day on 3/29/10 because she was needed. (*Id.* at ¶72.) Abert requested that she be paid for her Paid Time Off Days and the suspension be removed from her personnel file but Miller refused. (*Id.* at ¶77.) On 2/11/11, Miller and Leroy held a meeting with staff regarding bringing McPeake back to work at Greenery. (*Id.* at ¶78.) Greenery rehired McPeake to work at Greenery as a case manager with the approval, assistance, and cooperation of RehabCare. (*Id.* at ¶¶80, 89.) Taken together, these factual allegations are sufficient to suggest that RehabCare plausibly is a joint employer of Greenery's employees. At the very least, a questions of fact exist as to RehabCare's status as a joint employer. Thus, RehabCare's argument that it is not a joint employer of Greenery's employees does not bar application of the equitable tolling doctrine.

RehabCare's second argument, however, has some merit. RehabCare submits that Plaintiff has not alleged that it actively misled her so as to prevent her from filing her charge with the EEOC. In support, RehabCare contends that in order to avail herself of the equitable tolling doctrine, Plaintiff must have evidence that RehabCare purposefully misled her at the time of her discharge, which would only be possible if RehabCare ended the employment of both Abert and McPeake with the known intention of rehiring McPeake at some time in the future.

RehabCare submits that no such evidence exists.[12]

While Plaintiff is not required to offer *evidence*, as RehabCare suggests, of its intent at the time of Plaintiff's discharge in opposing a motion to dismiss, notably absent from the Complaint are factual allegations suggesting that RehabCare or the other Defendants lied to or misled Abert as to the reason for her suspension and forced resignation. Plaintiff asks this Court to infer such intent from the discrete act of rehiring McPeake some 299 days after her discharge. However, no factual foundation exists in the Complaint from which this inference can be drawn.

As a preliminary matter, the Court notes that the primary allegations upon which Plaintiff relies are conclusory in nature, and thus, the Court is not required to accept them as true. These conclusory allegations include that RehabCare and Greenery conspired to mislead her into thinking that they were treating her and McPeake in a similar way, and lied about the basis of her termination to preclude her from filing a Title VII action based on a hostile work environment, disparate treatment, suspension and termination due to stereotyping, gender discrimination and retaliation. (Compl. ¶¶87, 95.)

Moreover, an examination of the relevant factual assertions in the Complaint reveals no basis for inferring that Defendants misled Plaintiff about the reason for her termination. In her Complaint, Plaintiff alleges that the reason given by Defendants for her suspension on 3/29/10 was that Leroy Drew, the administrator of Greenery, and Trish Miller of RehabCare no longer wanted her in the building because she showed up for work that day, after attending a court proceeding to get a PFA order (as a victim of an assault), with a black eye and would not

---

[12] RehabCare further submits that when it discharged McPeake, there were no plans to rehire him or to cause him to be newly hired by another employer such as Greenery. (RehabCare's Reply Br. at 5, ECF No. 42.) These allegations, however, are not contained in the Complaint, and thus, will be disregarded for purposes of deciding RehabCare's motion to dismiss.

comment on the matter to co-workers. (Compl. ¶¶ 64-66, 68-69, 71, 76.) Plaintiff further alleges that both Miller and Leroy stated that they did not want either her or McPeake in the building. (Compl. ¶¶68-69.) Importantly, Plaintiff does not allege that McPeake was treated any differently as a result of the events on March 28 and 29, 2010, at that time.

On 4/14/10, Plaintiff submitted a written request for reinstatement to the head of HR at RehabCare, but did not receive a response. (Compl. ¶74.) Instead, on 4/18/10, Miller called Plaintiff to a meeting at which she was told there were no openings in the Pittsburgh area but she could return to work at a RehabCare facility in Maryland. (Compl. ¶75.) Plaintiff refused to move to Maryland and was forced to resign. Significantly, Plaintiff does not allege that Defendants treated McPeake more favorably at that time, that is, she does not allege that Defendants allowed him to return to work at the Greenery or another facility of Defendants in the Pittsburgh area at the time of Plaintiff's forced resignation.

Rather, Plaintiff asserts that ten months later, on or around 2/11/11, she learned a meeting was held by Miller and Drew with the staff at Greenery inquiring as to their thoughts about bringing McPeake back to work at Greenery. (Compl. ¶78.) Although some of the workers objected, Greenery rehired McPeake sometime after 2/11/11 to work as a case manager. (Compl. ¶¶79-80.) No facts are alleged as to what precipitated McPeake's rehire, nor does Plaintiff allege any facts to suggest that Defendants' intent all along was to rehire McPeake. Instead, Plaintiff is attempting to boot strap a separate and discrete act that occurred 10 months later to impute a discriminatory motive for the suspension and constructive discharge that occurred 10 months earlier. This she cannot do, as no relation between these two incidents can be inferred from the factual allegations in the Complaint. As such, Plaintiff's contention that Defendants possessed an improper motive at the time of her alleged constructive discharge is

based purely on speculation. Thus, based on the factual allegations pled in the Complaint, it is not reasonable to infer from Greenery's rehiring of McPeake on 2/11/11, some ten months after Plaintiff's forced resignation, that Defendants actively misled her in March/April of 2010 as to the real reason for her suspension and alleged constructive discharge.

The cases upon which Plaintiff relies do not convince the Court otherwise. In *Oshiver*, the court of appeals reversed the district court's dismissal of a discriminatory discharge claim, holding that the factual allegations were sufficient to support application of the equitable tolling doctrine. 38 F.3d at 1391-92. A distinguishable factor in *Oshiver* is that at the time of the employee's dismissal, the employer told her there was not enough work to sustain her position when apparently there was—the employer hired a male employee to take over her duties shortly after her dismissal. *Id.* at 1384. However, Oshiver did not learn of the hiring of the male employee until 13 months later. *Id.* Moreover, at the time of her dismissal, the employer told her that it would contact her if either additional hourly work or an associate position became available. *Id.* By contrast here, Plaintiff has not alleged that she subsequently learned that McPeake was allowed to come back to work within a short period of time after her alleged constructive discharge, nor has she alleged that Defendants told her that they would contact her if a position in the Pittsburgh area became available. Therefore, unlike *Oshiver,* here it is not reasonable to infer that Defendants misled Abert at the time of her suspension and/or forced resignation.

Plaintiff's reliance on *Hart v. J.T. Baker Chem. Co.,* 598 F.2d 829 (3d Cir. 1979) is also misplaced. In that case, the court of appeals upheld the grant of summary judgment, finding that all of the facts upon which the charge of discrimination was predicated were known to the employee on her date of discharge, and there was a lack of evidence to show the employer

contributed to the employee's delay in filing her charge of discrimination with the EEOC. *Id.* at 833-34. Although the employee suspected at the time of her termination that gender may have been a motivating factor in her discharge, she did not file her charge of discrimination with the EEOC until 477 days after the discriminatory act occurred. Similar to the plaintiff in *Hart,* here Abert knew of her injury and the source of that injury at the time of her alleged constructive discharge, and she has failed to allege facts to show that Defendants contributed to the delay in filing her charge with the EEOC vis a vis her constructive discharge claim.

Nor does *Meyer v. Riegel Products Corp.,* 720 F.2d 303 (3d Cir. 1983), provide support for Plaintiff's position.[13] In that case, the district court granted summary judgment on Plaintiff's ADEA claim based on its conclusion that the filing of the charge of discrimination with the Department of Labor was untimely. The court of appeals reversed, finding the employee had alleged facts which, taken as true, suggested that the employer has deceived him into postponing the filing of his claim. Around the time the employee received notice of his dismissal, he suspected that age played a role in his dismissal. *Id.* at 305. Several weeks later, the employee wrote to his employer requesting, inter alia, the reason for his dismissal. In response, his employer informed him that his dismissal was the result of a corporate reorganization after a

---

[13] Defendants Greenery and Fundamental address Plaintiff's argument that they actively misled her as to the real reason for her discharge by arguing that her reliance on *Meyer* is misplaced. In support, Greenery and Fundamental submit that *Meyer* is distinguishable from the instant matter in two ways. First, Defendants submit that Abert has not alleged that they misrepresented the reason for her alleged constructive discharge, but only challenges Greenery's later hiring of McPeake. (Reply Br. of Greenery & Fundamental at 3-4, ECF No. 38.) (emphasis in original). Second, Defendants argue that the employer in *Meyer* terminated a protected employee and misrepresented and/or concealed the fact that they had replaced him with a non-protected employee shortly after the protected employee's dismissal. Here, both Abert and McPeake were removed from Greenery around the same time. Thus, Greenery and Fundamental contend her claims for constructive discharge, hostile work environment, and retaliation must be dismissed as untimely.

recent acquisition.  At approximately the same time the employer provided this response it hired a 28 year old with a degree in biology and chemistry to perform many of the employee's prior environmental responsibilities.  In the meantime, the employee consulted with an attorney who told him at that time he could not likely establish a prima facie case of age discrimination, but encouraged him to try and uncover evidence that might confirm his suspicions.  Approximately four months later, the employee learned that the employer hired the 28 year old to perform some of his responsibilities and he informed his attorney, who shortly thereafter filed a complaint with the New Jersey Division of Civil Rights.  Four months later, the employee filed a charge of discrimination with the Department of Labor, which was received 319 days after the act of discrimination (notice of dismissal) occurred.  *Id.* 305-06.  The court of appeals in *Meyer* found that the employer's letter informing its former employee that his dismissal was due to a corporate reorganization, while at the same time replacing him with a younger employee, could have caused him to temporarily defer filing his charge of discrimination with the Department of Labor, and therefore, he was entitled to invoke the equitable tolling doctrine.  *Id.* at 307-09.  The fact that the employee consulted an attorney did not change the result.  *Id.* at 309.

Unlike the employer in *Meyers,* here Abert has not pled facts to show, or from which it can be inferred, that the reason given by Defendants for her suspension and alleged constructive discharge was untrue—Abert has not alleged any acts of deception at around the time of her alleged constructive discharge to show that Defendants actively misled her as to the reason for her discharge.  Rather, she asserts that the rehiring of McPeake 299 days after her constructive discharge creates the inference.  As explained above, however, the relationship between these two events is too tenuous and discrete to give rise to a reasonable inference in her favor.

In summary, the equitable tolling doctrine should be extended sparingly. There are no

facts to suggest that Defendants actively tried to mislead Plaintiff. At the time she resigned, McPeake also left his employment. McPeake did not work at RehabCare or Greenery for nearly ten months, consistent with Defendants expressed intent to remove both Plaintiff and McPeake from the location. At most, the facts suggest that Defendants had a change of heart when they allowed McPeake to be rehired at Greenery, and there is no evidence to suggest that they would not have allowed Plaintiff to return had she tried.

Therefore, the Court finds, as a matter of law, that Plaintiff has failed to show that she was actively misled as to the true reason for her suspension and/or her alleged constructive discharge. Accordingly, the equitable tolling doctrine cannot save her untimely constructive discharge claim.[14]

Likewise, the Court finds that the equitable tolling doctrine does not apply to Plaintiff's claims for hostile work environment or retaliation. Abert fails to allege any acts of misleading or deception which would have caused her to delay in filing her charge of discrimination as to the hostile work environment and retaliation claims. She possessed all of the facts necessary to

---

[14] Plaintiff also argues, summarily, that Defendants should be equitably estopped from claiming expiration of the 300 day statute of limitations as a defense due to their misrepresentation of the facts and their motive. (Pl.'s Mem. in Opp'n at 7.) However, this argument is completely undeveloped and wholly inadequate, and, as such, it is not properly raised before this Court. *Pennsylvania v. U.S. Dep't of Health & Human Serv.,* 101 F.3d 939, 945 (3d Cir. 1996) (conclusory assertions, unaccompanied by substantial argument, are insufficient to bring an issue before the court); *Massie v. U.S. Dep't of Housing & Urban Devel.,* Civ. A. No. 06-1004, 2007 WL 184827, *3 n. 5 (W.D.Pa. Jan. 19, 2007) (one sentence argument lacked any substantive or meaningful analysis and thus was deemed to be undeveloped and wholly inadequate) (citing *Pennsylvania, supra*). In addition, Plaintiff submits she should be accorded the right to take discovery to ascertain the circumstances surrounding her termination and McPeake's rehire. (Pl.'s Mem. in Opp'n at 7.) Even giving Plaintiff the benefit of all reasonable inferences from the facts alleged, the Court finds that an improper motive cannot be inferred from the facts as alleged with regard to her constructive discharge claim. Therefore, she is not entitled to discovery on that claim. Moreover, Plaintiff's request for discovery indicates that she does not currently possess additional facts which could be asserted if allowed to amend her Complaint.

assert these claims at the time of her discharge.  Moreover, in her brief in opposition to the motions to dismiss, Abert does not appear to be arguing that the equitable tolling doctrine should be applied to her hostile work environment and retaliation claims.[15]  She utterly fails to explain how the rehiring of McPeake after 2/11/11 deceived or misled her as to the facts supporting her claims for hostile work environment and retaliation.  For these reasons, the Court concludes that the equitable tolling doctrine does not apply to Plaintiff's hostile work environment and retaliation claims.

### b.    Continuing Violation Doctrine

While the equitable tolling doctrine does not save her constructive discharge, hostile work environment, and retaliation claims, Abert also relies on the continuing violation theory to extend the statute of limitations. Plaintiff submits that "her claims of hostile harassment followed by a suspension and termination replete with falsehoods as to the basis of her termination, ending with the rehiring of McPeake[,]" constitutes a continuing violation. (Pl.'s Mem. in Opp'n at 9, ECF No. 35.)  The thrust of Plaintiff's argument is that McPeake's rehiring on February 11, 2011 is part of a continuing violation, thus delaying the accrual of her Title VII claims until McPeake was rehired on February 11, 2011—the last act in the continuing violation.

Defendants oppose application of the continuing violation doctrine here arguing that Plaintiff's alleged constructive discharge, Defendants' alleged retaliation, and the rehiring of McPeake are separate and discrete acts, and therefore, a continuing violation cannot be established to extend the 300-day time limit.  As to the hostile work environment claim,

---

[15] Indeed, Abert states in her brief that she alleged in her Complaint that "she was misled by Defendants as to the basis of her <u>termination</u> in order to preclude her from filing a timely charge of discrimination based on disparate treatment."  Pl.'s Mem. in Opp'n at 5, ECF No. 35 (citing Compl. ¶¶82, 85, 93-95).

Defendants contend that the rehiring of McPeake, a discrete act, is unrelated to Plaintiff's hostile work environment claim, and thus, cannot be considered part of a continuing violation. Defendant RehabCare further submits that even if McPeake's rehiring is found to be related to the hostile work environment, courts have refused to apply the continuing violation theory in Title VII cases involving prolonged periods during which no harassment occurred. For the reasons set forth below, the Court finds that the continuing violation doctrine does not apply to Plaintiff's Title VII claims.

The continuing violation doctrine allows a plaintiff to "pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995) (citing *Bronze Shields, Inc. v. New Jersey Dep't of Civ. Serv.*, 667 F.2d 1074, 1081 (3d Cir. 1981); *Jewett v. Int'l Tel. & Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981)). In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002), the Supreme Court addressed whether the continuing violation doctrine could be applied to Plaintiff's discrimination, hostile work environment, and retaliation claims under Title VII, which were otherwise time-barred. The Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period[,]" "even when they are related to acts alleged in timely filed charges." *Id.* at 105, 113. The Court reasoned that discrete acts, such as "termination, failure to promote, denial of transfer, or refusal to hire," are easy to identify, and each constitutes a separate actionable "unlawful employment practice," provided it occurs within the 300-day time period. *Id.* at 114. *See also O'Connor v. City of Newark,* 440 F.3d 125, 127 (3d Cir. 2006) (for purposes of Title VII, "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of

training, [and] wrongful accusation" are discrete acts for which the limitations period begins to run from the date of the act). Accordingly, the Supreme Court held that the continuing violation theory does not apply to save otherwise untimely discrete unlawful employment actions.  536 U.S. at 114.

Based on *Morgan,* it is clear that Abert's alleged constructive discharge, and Defendants' alleged retaliation (suspension and constructive discharge) against her for complaining about McPeake's harassment, are discrete acts and were filed beyond the 300-day limitations period. As such, they cannot be saved by the continuing violation doctrine and are time-barred.

On the other hand, the Supreme Court in *Morgan* held that the continuing violation theory can be applied to hostile work environment claims.   In so holding, the Court explained that hostile work environment claims differ from discrete acts in that "[t]heir very nature involves repeated conduct." *Id.* at 115 (citation omitted).  "The 'unlawful employment practice' therefore cannot be said to occur on any particular day[, but rather,] occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citation omitted).  Thus, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice[,]'" and to be considered timely, the employee must file a charge with the appropriate agency within 180 or 300 days of any act that is part of the hostile work environment. *Id.* at 117-18.  Moreover, as long as an "act contributing to the hostile work environment claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Id.* at 117.

In order to be able to apply the continuing violation doctrine to her hostile work environment claim, Abert must demonstrate two things: (1) "at least one act occurred within the

filing period" and (2) "the harassment is 'more than the occurrence of isolated or sporadic acts of intentional discrimination.'" *West,* 45 F.3d at 754-55 (citations omitted). As to the first requirement, Plaintiff has alleged that Defendants rehired McPeake on or after 2/11/11, which is within 300 days of the date Plaintiff filed her charge with the EEOC. Thus, Plaintiff appears to have met the first requirement.

With regard to the second requirement, the court must distinguish "between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern." *Id.* at 755. Previously, the court of appeals for this circuit adopted the approach delineated by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State University,* 715 F.2d 971, 981 (5th Cir. 1983), to assist in making this determination. *Berry* requires the court to consider three factors:

> (i) subject matter–do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation;
>
> (ii) frequency–are the alleged acts recurring, or more in the nature of an isolated work assignment or employment decision; and
>
> (iii) degree of permanence–does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights [(e.g., denial of promotion, suspension, termination)], or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent upon a continuing intent to discriminate?

*Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481-82 (3d Cir. 1997) (citing *West,* 45 F.3d at 755 n. 9, and *Berry, supra*).

Very recently, the court of appeals had an opportunity to clarify the continuing violation doctrine in this circuit, in light of the Supreme Court's decision in *Morgan,* and concluded that after *Morgan,* the third factor—permanency—is no longer required to establish a continuing

violation. *Mandel v. M & O Packaging Corp.,* ___ F.3d ___, 2013 WL 141890, at * 6 (3d Cir. Jan. 14, 2013) (citing *Morgan,* 536 U.S. at 117-18).[16] Therefore, the Court will consider whether Plaintiff has satisfied the subject matter and frequency factors to establish a continuing violation.

Turning first to the subject matter element, the Court finds that the rehiring of McPeake is a discrete act that differs in kind from the conduct alleged in support of her hostile work environment claim. For example, the harassing conduct, which allegedly occurred while Plaintiff was employed at Greenery, was engaged in primarily by McPeake, who is alleged to have openly conducted an extra-marital affair with Greenery's Assistant Director of Nursing in their workplace at Greenery. McPeake's alleged harassment of Plaintiff consisted of assigning her to distant, inconvenient work sites, engaging in threatening conduct towards her person and reputation at work by falsely accusing her of stealing things from work and him personally, refusing to answer work related questions, falsely accusing her of deleting matters from his computer, telling co-workers that Plaintiff was "crazy," taking items from her purse, throwing papers at her, shoving a chair at her, and using foul language toward her. (Compl. ¶¶35, 38-39, 49.) In addition, Plaintiff alleges that the conduct of McPeake and his mistress at work was such that some of her co-workers, patients, and her supervisor, Miller, made comments to Plaintiff about McPeake's affair, causing her to be upset and feel humiliated and embarrassed. (Compl. ¶¶45-48.) This harassing conduct allegedly began around the beginning of December of 2009 and continued up to Plaintiff's suspension on 3/29/10, and suggests a single, unlawful employment practice. By contrast, the act of rehiring McPeake was done some 299 days after Plaintiff's employment ended and differs in kind from the acts alleged in support of Plaintiff's

---

[16] Thus, to the extent the court of appeals adopted *Berry* in *West* and *Rush*, the Supreme Court's decision in *Morgan* supersedes those decisions. *Morgan,* 2013 WL 141890, at *6.

hostile work environment claim.

Plaintiff attempts to circumvent the inevitable conclusion that the harassment ended when her employment ended by first acknowledging that the "seeming culmination" of the harassing conduct occurred when "Defendants suspended and then fired [her when she] reported to work after . . . obtain[ing] a PFA [order] and appeared in a battered condition[,]" and then arguing that the "real culmination of condoning McPeake's conduct was the rehiring of McPeake after misrepresenting to [her] that she and the harassing McPeake were being treated in a sex neutral manner because the defendants could not be judge and jury." Pl.'s Mem. in Opp'n at 11, ECF No. 35. This argument too must fail. Notwithstanding the fact that the Supreme Court has found that the decision to hire or rehire constitutes a discrete employment practice, the rehiring of McPeake cannot be considered related to or part of a continuing pattern of harassing conduct. Plaintiff was no longer employed at Greenery when McPeake was rehired, and thus, technically the work environment in which Plaintiff could continue to be harassed no longer existed. Moreover, as this Court found above, the factual allegations do not support a reasonable inference that Defendants actively misled Abert as to the reason for her suspension and/or subsequent discharge. Therefore, Plaintiff cannot rely on a non-existent misrepresentation to connect the discrete act of rehiring McPeake with the prior, unrelated harassing conduct of McPeake and her co-workers.

Abert's reliance on *Aubrey v. City of Bethlehem,* 466 F. App'x 88 (3d Cir. 2012) to save her untimely hostile work environment claim is misplaced. In that case, plaintiff attempted to save his untimely claims under the Americans with Disabilities Act for failure to promote and failure to accommodate, by arguing that the defendant's acts constituted discrimination of a continuing nature. 466 F. App'x at 92. The court of appeals rejected this argument finding that

the nature of plaintiff's claims did not involve repeated conduct, based on the Supreme Court's explicit refusal to apply the continuing violation doctrine to save time-barred claims for discrete discriminatory acts in *Morgan*. *Id.* at 93 (citing *Morgan*, 536 U.S. at 115). Thus, the court of appeals' holding in *Aubrey* actually supports this Court's conclusion that the rehiring of McPeake is a discrete act and not part of a continuing pattern of harassment.

As to the frequency element, Plaintiff has failed to show that the act of rehiring McPeake was a recurring act. Rather, the factual allegations make clear that the rehiring of McPeake was an isolated employment decision that occurred at least 299 days after Plaintiff's alleged constructive discharge, and is different in kind from the alleged harassing conduct that occurred between December of 2009 and April of 2010. For these reasons, the Court finds that Plaintiff has not established the frequency factor.

At best, Plaintiff may have an actionable claim for discriminatory failure to rehire based on gender, the merits of which are discussed below. However, because she has failed to establish the second prong of the continuing violation doctrine, that doctrine cannot save her untimely hostile work environment claim.[17]

In conclusion, Plaintiff's Title VII claims for constructive discharge, hostile work environment, and retaliation were filed beyond the 300-day statute of limitations and are not saved by either the equitable tolling doctrine or the continuing violation theory. Accordingly, the Court recommends that Plaintiff's Title VII claims for constructive discharge (in Count I), hostile work environment (Count II), and retaliation (Count III) be dismissed with prejudice.

---

[17] RehabCare also argues that Plaintiff's hostile work environment claim against it must fail because Plaintiff needed to allege facts to show that RehabCare is a joint employer with the Greenery, which she failed to do. This argument fails for the reasons set forth above with regard to application of the equitable tolling doctrine. *See* discussion, *supra*, at 18-20.

## 2.     Count I – Discriminatory Failure to Rehire

In Count I of the Complaint, Plaintiff also asserts a claim for discriminatory failure to rehire based on gender under Title VII. Defendants have moved to dismiss this claim arguing that Plaintiff has failed to plead a *prima facie* case of discriminatory failure to rehire. To establish a *prima facie* case of a discriminatory failure to rehire claim, Plaintiff must show that (1) she belongs to a protected class; (2) she applied for and was qualified for a position for which the employer was seeking applicants; (3) despite her qualifications she was not hired; and (4) after her rejection, the position remained vacant and the employer continued to seek applications from persons possessing her qualifications, or the position was filled in a manner giving rise to an inference of discrimination. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994)[18] (failure to hire or promote claim under Title VII) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)); *see also Still v. Shinseki,* No. 11-4205, 2012 WL 3011746, at *2 (3d Cir. July 24, 2012) (failure to hire claim based on disability in violation of Rehabilitation Act of 1973) (citing *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir. 1996)).

Defendants submit that Plaintiff has failed to establish the second element—that she applied for and was qualified for the position. Defendants contend that Plaintiff has failed to allege in her Complaint that she applied for a position with either Greenery or RehabCare. In addition, Defendants Greenery and Fundamental argue that Plaintiff has not alleged that she expressed any interest in a position with Greenery after her alleged constructive discharge. Defendant RehabCare further submits that Plaintiff has failed to allege that she was qualified and

---

[18] Plaintiff contends Defendants relied on *Fuentes* in support of their argument, and attempts to distinguish it factually from the case at bar. A clear reading of Defendants' briefs indicates that they relied on *Fuentes* only for stating the four pronged test for establishing a prima facie case of discriminatory failure to hire, which the Court finds is an accurate statement of the law.

was not hired for a position with either Greenery or RehabCare.[19]

In response, Plaintiff argues she has pled sufficient facts to support a plausible claim for failure to rehire. Specifically, Plaintiff submits that while she did not assert in the Complaint that she applied for employment after she was terminated, she did assert that she asked to be reinstated while she was suspended. (Compl. ¶74.) Plaintiff contends she had no reason to apply for a position in light of RehabCare's failure to reply to her request for reinstatement. Plaintiff's argument is flawed, however, because she did get a response from RehabCare—Miller called her on April 18, 2010 and offered her a position at a facility in Maryland. Plaintiff attempts to circumvent this fact by arguing that she was only alerted to Defendants' alleged misrepresentation of her employment status after Greenery rehired McPeake in February of 2011. However, Plaintiff fails to state how discovering McPeake's rehire negates either her failure to apply for any new vacancies that occurred after her resignation or to inform Defendants of her desire to be considered for any subsequent openings in the Pittsburgh area.

In support of her argument, Plaintiff cites *Sarullo v. U.S. Postal Service,* 352 F.3d 789, 798 (3d Cir. 2003), for the proposition that an employee who is seeking to be rehired to a former job need only show that the employer continued to seek out individuals with similar qualifications after refusing to rehire the employee under circumstances that raise an inference of unlawful discrimination. (Pl.'s Mem. in Opp'n at 12, ECF No. 35.) In actuality, this proposition is gleaned from the fourth prong of the prima facie case of employment discrimination set forth

---

[19] RehabCare also argues that Plaintiff's discriminatory failure to rehire claim must fail because Greenery rehired McPeake and Plaintiff has failed to allege facts to show that RehabCare is a joint employer of the employees of Greenery, specifically McPeake. As explained above, issues of fact exist as to whether RehabCare is a joint employer of McPeake. *See* discussion, *supra,* at 18-20. Thus, this argument is unavailing.

by the court of appeals in *Sarullo,* and is not an actual holding in the case.[20] Plaintiff then reiterates allegations from the Complaint as to Defendants' allegedly discriminatory motive in rehiring McPeake. (Pl.'s Mem. in Opp'n at 12-13, ECF No. 35 (citing Compl. ¶¶ 94-95).) However, these allegations do not show or suggest that she has met the second prong of her prima facie case. Lastly, Plaintiff argues that she cannot be expected to possess all of the facts and to assert them before engaging in discovery, and that discovery is necessary to answer a myriad of questions relating to the circumstances surrounding the rehiring of McPeake. Plaintiff's argument misses the mark, as the evidence which she seeks to obtain through discovery is irrelevant to establishing the *second prong* of a prima facie case of failure to rehire, and the basis for Defendants' motion—whether she applied for or informed Defendants of her desire to come back to work at Greenery, and was qualified for the position.

Plaintiff's failure to plead that she applied for a position with Greenery or RehabCare after her alleged constructive discharge is not, however, fatal to her failure to rehire claim. The court of appeals has held that the "failure to formally apply for a job will not bar a plaintiff from establish[ing] a prima facie case for discriminatory hiring[.]" *Lula v. Network Appliance, Inc.,* 245 F. App'x 149, 152 (3d Cir. 2007). In that instance, "the plaintiff must show that she made every reasonable effort to convey her interest in the job to her employer, *EEOC v. Metal Serv.*

---

[20] The focus of the court of appeals in *Sarullo* was on whether the former employee had established some causal nexus between his membership in a protected class and the decision not to rehire him. The court concluded that the employee failed to show that similarly situated employees were treated more favorably, and thus, the Postal Service's refusal to rehire him did not raise an inference of discriminatory animus. *Id.* at 798. In the case at bar, however, Defendants are not challenging the sufficiency of the Complaint on the basis of the fourth prong of the prima facie case of failure to rehire in their motions to dismiss, and *Sarullo* does not address the argument advanced by the Defendants—whether Plaintiff has failed to establish the second prong of a prima facie case of failure to rehire. Accordingly, Plaintiff's reliance on *Sarullo* at this juncture is misplaced.

*Co.*, 892 F.2d 341, 349 (3d Cir.1990), was deterred from applying by the employer's discriminatory practices and would have applied for the position but for those practices, or had a genuine and real interest in the position but reasonably believed that a formal application would be futile. *Newark Branch, NAACP v. Town of Harrison*, 907 F.2d 1408 (3d Cir.1990)." *Lula,* 245 F. App'x at 152. Plaintiff's attempt to distinguish *Lulu* factually from the case at bar falls short. [21] In *Lulu*, the employee's job was eliminated due to a RIF. At the time of termination, the employer gave Lulu a document informing terminated employees that they were free to submit a resume if they saw a position for which they felt qualified. *Lulu*, 245 F. App'x at 150. Around the same time, the employer was looking to hire a sales representative in another geographic area due to a recent resignation. *Id.* at 150-51. Lulu did not submit a resume for this position. The court of appeals held that Lulu did not meet the requirements to overcome her failure to formally apply for the sales representative position. *Id.* at 152. In so holding, the court concluded that Lulu's efforts of requesting the district manager and two vice presidents to consider her for the position did not rise to the "every reasonable effort" standard set forth in *Metal Service Co. Id.* at 153. The court of appeals explained:

> In [*Metal Service Co.*]*,* we found that two men, seeking employment and whom an employer contended did not formally apply directly to the employer, met the requirements of conveying their interest because, among other things, the men had periodically checked on applications they had submitted to a third-party service that the employer utilized for hiring purposes and even tried to formally apply directly with the employer several times. *Metal Serv. Co.*, 892 F.2d at 349. Here, the record is clear

---

[21] Abert rests the distinction on the following facts: the termination in *Lulu* occurred during a reduction in force (RIF), the terminated employees were told to submit resumes if a vacancy occurred, when a vacancy occurred the plaintiff failed to submit a resume, and even after the benefit of discovery, plaintiff failed to demonstrate that her employer retained someone similarly situated. (Pl.'s Mem. in Opp'n at 14, ECF No. 35.)

that Lula did not make any effort to formally apply for the sales position even though NetApp instructed her to submit a resumé if she saw a position for which she felt qualified. Moreover, she did not follow up on her inquiries to the vice presidents after they said that they would get back to her, despite their failure to respond. Nothing in the record suggests that Lula was dissuaded from formally applying because of any discriminatory practice or that she believed her application to be futile. Therefore, we conclude that Lula has not established a prima facie case of discriminatory hiring.

*Id.* Unlike the plaintiffs in *Metal Service Co.*, Abert does not allege that she submitted an application for employment, or tried to submit an application but was unable to do so, nor does she allege that she checked in periodically with either RehabCare or Greenery to see if any new vacancies arose. Rather, Abert's situation is more closely analogous to the plaintiff in *Lulu*, in that although Abert requested *reinstatement*, she never followed up with either RehabCare or Greenery after her resignation to inform them of her continued interest in coming back to work at one of their facilities in the Pittsburgh area. In light of this, the Court cannot find that a reasonable inference exists from the facts alleged that Abert's efforts satisfied the "every reasonable effort" standard of *Metal Service Co.*

Plaintiff cites *McGuffey v. Brink's Inc.,* 558 F.Supp. 2d 565 (E.D.Pa. 2008), for the same "every reasonable effort" standard reiterated in *Lulu*,[22] but then fails to explain how she meets

---

[22] Specifically, Plaintiff quotes the following discussion from *McGuffey*:

> In the absence of a formal job application, a plaintiff must show that he "did everything reasonably possible" to make his interest in the position known to the defendant, or that he "would have applied but for" the defendant's discriminatory practice, or that he "reasonably believed that a formal application would be futile." *Newark Branch, NAACP v. Town of Harrison*, 907 F.2d 1408, 1414 (3d Cir.1990); *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 366-66, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in

this standard. Plaintiff fails to plead that she communicated to RehabCare or Greenery her desire to be rehired if an opening occurred in Pittsburgh or that she requested to be considered for future openings in Pittsburgh at the Greenery or RehabCare. Nor does she allege that when she submitted her resignation, either RehabCare or Greenery told her she could apply for new vacancies for which she was qualified that may arise in the Pittsburgh area, or that they would inform her of any such vacancies. In short, Plaintiff has failed to allege facts to suggest that, or at least which raise factual questions, as to whether she made every reasonable effort to communicate her interest in returning to Greenery known to Defendants.

Instead of addressing this standard head on, Plaintiff submits that she asserted her superior qualifications—she possesses a bachelor's and masters' degree in occupational therapy, while McPeake possesses only an associate's degree—and has far more experience than McPeake. (Pl.'s Mem. in Opp'n at 15, ECF No. 35 (citing Compl. ¶¶19, 28).) According to Plaintiff, these disparate qualifications, along with the pending criminal charges against McPeake, of which Greenery and RehabCare had knowledge, create a reasonable inference of a

---

a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application"). When a job opening is not posted, courts generally find that a job-seeker's expression of interest is sufficient for application. *See, e.g., Box v. A & P Tea Co.*, 772 F.2d 1372, 1376-77 (7th Cir.1985) (finding that when employer had no system to ensure that all interested applicants could apply, no formal applications were sought, and job openings were not posted, "the plaintiff can establish the application element of the prima facie case by showing that, had she known of ... [the] opening, she would have applied"); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 568 (8th Cir.1982) (finding that because vacancy was not posted and plaintiff did not hear about it from another source until it was already filled, expression of general desire to advance was sufficient for application).

558 F.Supp. 2d at 570.

discriminatory motive. (*Id.* (citing Compl. ¶¶57-59).) This argument goes to the sufficiency of the pleading of the fourth prong of the prima facie case, and while these allegations may also be pertinent to showing she was qualified for the position, they still do not establish the first requirement of the second element—that she applied for the position or made "every reasonable effort" to apply or make her intentions known to Defendants—which is the subject of Defendants' motions to dismiss.

Plaintiff does submit that in light of her suspension without pay, Defendants' misrepresentations, Defendants' refusal to reinstate her, her ultimate termination, and Defendants never advising her of any openings, she had no reason to think Defendants would rehire her or McPeake until she learned McPeake was rehired. (Pl.'s Mem. in Opp'n at 14, ECF No. 35.) However, the factual allegations pled in the Complaint belie this argument. Plaintiff admits that she was in fact offered a position by Miller of RehabCare after she requested reinstatement. Unfortunately, the position required a move to Maryland, which Plaintiff declined. Moreover, as determined above, the Complaint does not allege facts from which it can reasonably be inferred that Defendants lied or deceived Plaintiff as to the reason for her discharge. Nor does Plaintiff allege that she asked to be considered for any future openings or that Defendants were obligated to inform her of any subsequent openings.

Accordingly, the Court finds that Plaintiff has failed to sufficiently plead facts to show or suggest a plausible claim of discriminatory failure to rehire, vis a vis the second prong of the prima facie case. However, because it does not appear to be beyond the realm of possibilities that Plaintiff may be able to plead sufficient facts to support application of the relaxed "every reasonable effort" standard, the Court recommends that the failure to rehire claim be dismissed without prejudice. It is further recommended that Plaintiff be allowed to file a motion for leave

to amend the complaint, should she so desire, with respect to her failure to rehire claim. Should she decide not to move to amend, it is recommended that she notify the court of her desire to stand on her original complaint, and in that event, the Court recommends that the motions to dismiss the failure to rehire claim be granted with prejudice.

### 3.    <u>Count IV – Violation of the Crime Victims Employment Protection Act</u>

RehabCare seeks to dismiss Count IV of Plaintiff's Complaint, in which Plaintiff alleges that she was wrongfully discharged in violation of the Crime Victims Employment Protection Act, 18 PA. CONS. STAT. ANN. § 4957, arguing that Plaintiff does not specifically tie her termination to her court attendance. The relevant portion of the Crime Victims Employment Protection Act provides, "An employer shall not deprive an employee of his employment, seniority position or benefits or threaten or otherwise coerce him with respect thereto, because the employee attends court by reason of being a victim of . . . a crime . . .." 18 PA. CONS. STAT. ANN. § 4957(a). By enacting the Crime Victims Employment Protection Act, the legislature sought to insure that crime victims could attend court proceedings without concern as to their employment status. *Rodgers v. Lorenz*, 25 A.3d 1229, 1231 (Pa. Super. Ct. 2011).

The superior court's opinion in *Rodgers* is instructive here. In that case, the superior court found that the plaintiff had sufficiently pled facts to state a claim under the Crime Victims Employment Protection Act. 25 A.3d at 1232. Those factual averments consisted of the following: "(1) [plaintiff] was an employee of [the defendant]; (2) he was the victim of an assault; (3) he informed management of his intention to report the crime to police and attend court proceedings; (4) he reported the crime to police; and (5) [the defendant] terminated him." *Id.* In the case at bar, Abert has pled facts quite similar to those pled in *Rodgers,* which the

superior court found sufficient. Specifically, Abert has averred in her Complaint that (1) she was employed as an occupational therapist by RehabCare; (2) she was the victim of an assault; (3) she went to court to seek a Protection from Abuse order the morning after the assault; (4) because of the court proceedings she was late to work (after having notified her employer that she would be late); and (5) that same day Plaintiff was notified by RehabCare that she was suspended without pay. Thus, this Court finds Abert's factual allegations sufficient to state a claim for a violation of the Crime Victims' Employment Protection Act.

RehabCare's argument that Plaintiff did not specifically tie her termination to her court attendance lacks merit. At this stage, Plaintiff is only required to allege facts which create a plausible claim. Plaintiff does not need to allege that her employer openly declared that its motivation for her suspension was her court attendance. On the day of her suspension, Plaintiff's face was visibly bruised and she informed Trish Miller that her reason for being late was because of her efforts to seek a Protection from Abuse order. While Plaintiff resigned approximately three weeks after her court appearance, she did so only after having been suspended without pay on the same day of her court appearance and after requesting to have her job back and being offered re-employment only if she would agree to move to and work in Maryland. Because Plaintiff was suspended without pay on the same day as her court appearance and was not re-instated, this Court finds it is reasonable to infer from the facts pled that Plaintiff was fired because of the court appearance.

Because Plaintiff has sufficiently pled facts which, if proven, would state a claim pursuant to the Crime Victims Employment Protection Act,[23] the Court recommends that

---

[23] For purposes of the RehabCare's motion to dismiss, this Court assumes, without specifically deciding, that Plaintiff's suspension without pay and RehabCare's subsequent offer of

RehabCare's Motion to Dismiss Count IV be denied.

### 4. Counts V & VI – Intentional & Negligent Infliction of Emotional Distress

Defendants have moved to dismiss Counts V and VI of the Complaint which set forth claims for intentional and negligent infliction of emotional distress, respectively, arguing in support that these claims are preempted by the Pennsylvania Workers' Compensation Act ("WCA"), which provides that workers' compensation is the exclusive remedy for injuries arising in the course of employment, 77 PA. STAT. §481(a).[24]  In addition, RehabCare argues, in the alternative, that the facts pled do not show or suggest that Defendants' conduct was extreme and outrageous with regard to Plaintiff's claim for intentional infliction of emotional distress ("IIED").  For the reasons set forth below, the Court finds no merit to Defendants' arguments with regard to the IIED claim.  However, the Court agrees with Defendants that Plaintiff's claim for negligent infliction of emotional distress ("NIED") is preempted by the WCA.

#### a. Intentional Infliction of Emotional Distress

As to their first argument, Defendants Greenery and Fundamental submit that any injuries Abert allegedly sustained because of their actions must be redressed solely under the WCA, because those injuries allegedly occurred during the course of her employment and arose from work-related activities. Similarly, RehabCare argues that the alleged harassing conduct all took place in the employment setting by co-workers, occurred on the employer's premises and is tied to the employment relationship, and therefore her IIED claim is barred by the WCA. According

---

employment at a distant location falls within the purview of the Crime Victims Employment Protection Act , i.e., depriving an employee of her "employment, seniority position or benefits." 18 PA. CONS. STAT. ANN. § 4957(a).

[24] The exclusivity provision of the WCA states:   "The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes . . . on account of any injury or death. . . ."  77 PA. STAT. §481(a).

to Defendants, a rebuttable presumption exists under Pennsylvania law that the injury is work-related where the alleged injury occurs on the employer's premises, citing in support *Hancuff v. Prism Technologies & Assemblies, LLC*, 357 F.Supp.2d 828, 832 (W.D.Pa. 2005) (citing *Kohler v. McCrory Stores*, 615 A.2d 27, 30 (Pa.1992)).[25]

Abert counters that an exception exists to the exclusivity provision of the WCA where the injury is caused by the intentional conduct of a third party for reasons personal to the tortfeasor and not directed against the injured party as an employee or because of her employment, which is exactly what she has pled here. In support, Abert relies primarily on *Durham Life Insurance Co. v. Evans*, 166 F.3d 139, 160 (3d Cir. 1999), *Barb v. Miles, Inc.*, 861 F.Supp. 356, 360 (W.D.Pa. 1994), and *Schweitzer v. Rockwell International*, 586 A.2d 383, 391 (Pa. Super. Ct. 1990).

In Pennsylvania, courts have allowed IIED claims for sexual harassment "where the injury arose from harassment 'personal in nature and not part of the proper employer-employee relationship.'" *Durham Life*, 166 F.3d at 160 (citing *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), *aff'd on other grounds*, 720 A.2d 745 (Pa. 1998); *Schweitzer*, 586 A.2d at 391). *See also Gruver v. Ezon Prod., Inc.*, 763 F.Supp. 772, 775-76 (M.D.Pa. 1991) (plaintiff's IIED

---

[25] Greenery and Fundamental also allege that to allow Abert to assert that her "claims were not work-related would be inconsistent in light of her Title VII claims." Defs.' Br. in Supp. Mot. to Dismiss at 10, ECF No. 21. In support, Greenery and Fundatmental cite *Vallerey Stylianoudis v. Westinghouse Credit Corp.*, 785 F.Supp. 530, 532 (W.D.Pa. 1992), for the proposition that Abert cannot claim on one hand that she suffered a hostile work environment in violation of Title VII and claim at the same time that the tortious injuries allegedly arising therefrom are exempt because they did not arise in the workplace. However, *Vallerey* is inapposite to the case at bar. The proposition cited by Greenery and Fundamental derives from the district court's disposition of the question of whether the emotional distress alleged by the plaintiff was an "injury" as defined by the WCA. *Id.* at 531. That issue is not presented here. In any event, this Court has determined that Abert cannot pursue her Title VII claim against Defendants, as it is time-barred. Therefore, no inconsistency exists.

claim was not preempted by WCA where it arose from alleged sexual harassment by a superior which had nothing to do with work but stemmed from personal reasons); *Arnold v. Kimberly Quality Care Nursing Serv.,* 762 F.Supp. 1182, 1183-84 (M.D.Pa. 1991) (same). In so holding, the courts have derived this exception from the language of the WCA itself, which provides, in pertinent part:

> The term "injury arising in the course of his employment," as used in this article, shall not include an injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment; . . .

77 PA. STAT. §411(1).[26] Thus, to set forth a valid claim under the personal animus exception to the WCA, "an employee must assert that [her] injuries are *not* work-related because [she] was injured by a co-worker for purely personal reasons." *Kohler,* 615 A.2d at 31.

In *Hoy,* the superior court found the harassment perpetrated on the plaintiff was personal in nature and not directed at her due to her employment. 691 A.2d at 482. In so concluding, the superior court noted that the evidence showed that the harassing conduct, which consisted of various forms of abusive treatment, including sexual propositions, vile and filthy language, off-color jokes, physical groping, and the posting of sexually suggestive pictures, occurred due to defendant's own reasons and was perpetrated by his own means. *Id.* at 479 & 481. The superior court thus held that the plaintiff's claim for IIED was not barred by the WCA. *Id.* at 482. In *Schweitzer,* the superior court held that plaintiff's IIED claim was not preempted by the WCA because the alleged emotional distress arose from harassment by a supervisor that was personal in nature, i.e., inappropriate touching, demanding a sexual relationship and making lewd

---

[26]The superior court has found that a co-worker can be a third person for purposes of Section 411(1). *Schweitzer*, 586 A.2d at 391 (citing *Mike v. Borough of Aliquippa*, 421 A.2d 251, 254 (Pa. Super. Ct. 1980)).

comments about plaintiff's body characteristics, and not part of the proper employer/employee relationship. 586 A.2d at 391. Similarly, in *Barb,* the district court held that because the plaintiff had alleged that a co-worker injured her by acts of harassment unrelated to the job, her claim for IIED was not preempted, based on the superior court's decision in *Schweitzer.* 861 F.Supp. at 360. The Court finds the decisions in *Hoy* and *Schweitzer* convincing and dispositive of the preemption issue here.

By contrast, in those cases where the courts have held the WCA preempted IIED claims for sexual harassment, the harassment did not stem from personal animosity, but rather, was directed at all employees within the protected class, *Hicks v. Arthur,* 843 F.Supp. 949, 958 (E.D.Pa. 1994), or, as in *Durham Life,* the attempt to harm plaintiff stemmed from her success at work, and thus, was arguably directed at her as an employee, *Durham Life,* 166 F.3d at 160. In so holding, the court of appeals in *Durham Life* opined that it understood "Pennsylvania law to extend workers' compensation preemption to personal animosity that develops from work-related events." *Id.* at 160 n. 16 (citing *Hammerstein v. Lindsay*, 655 A.2d 597, 601 (Pa.Super.Ct.1995); *Shaffer v. Procter & Gamble*, 604 A.2d 289 (Pa.Super.Ct.1992)) (other citation omitted). *See also McInerney v. Moyer Lumber & Hardware, Inc.,* 244 F.Supp. 2d 393, 400 (E.D.Pa. 2002) (collecting cases addressing the applicability of the personal animus exception). However, the *Durham Life* court stated that it was not expressing any "opinion as to whether an IIED claim for harassment more disconnected from the work situation would be preempted, for example where a supervisor sexually assaulted an employee or stalked her outside of work." 166 F.3d at 160 n. 16.

It appears that the cases relied upon by Defendants fall into this latter category of cases— where the personal animosity of the co-worker developed from work-related events. To the

extent Defendants rely on this line of cases to support preemption under the facts presented here, that reliance is misplaced. Although Pennsylvania law does provide that where the alleged injury occurs on the employer's premises a rebuttable presumption arises that the injury is work-related, here Plaintiff has adequately rebutted the presumption. Moreover, in some of the cases relied on by Defendants, the motivation for the intentional conduct was work-related events, not some personal bias totally unrelated to the workplace.

RehabCare submits that the alleged harassment, consisting of threats, false accusations, unjustifiable criticism, and derogatory and unfavorable comments, by co-workers occurred on the employer's premises and is tied to the employment relationship, and therefore, is barred by the WCA. In support, RehabCare cites cases for the proposition that where the alleged harassment occurred at the defendant's place of business, the IIED claim was barred by the WCA. However, the proffered proposition is not an accurate statement of the law in Pennsylvania. The critical inquiry, as RehabCare concedes (*see* RehabCare's Br. in Supp. of Mot. to Dismiss at 15, ECF No. 29), "'is whether the attack was motivated by personal reasons, as opposed to generalized contempt or hatred, and was sufficiently unrelated to the work situation so as not to arise out of the employment relationship.'" *McInerney,* 244 F.Supp. 2d at 400 (quoting *Fugarino v. Univ. Servs.,* 123 F.Supp. 2d 838, 844 (E.D.Pa. 2000)). "In other words, 'the plaintiff must demonstrate that an individual *other than the employer* acted in a tortious manner unrelated to the plaintiff's status as employee.'" *Jackson v. Lehigh Valley Physicians Group*, Civ. A. No. 08-3043, 2009 U.S. Dist. LEXIS 6936, *20 (E.D.Pa. Jan. 29, 2009) (quoting *Jamison v. Campbell Chain Cooper Tool,* Civ. A. No. 1:07-cv-0324, 2008 U.S. Dist. LEXIS 24896, at *9 (M.D.Pa. Mar. 27, 2008)) (emphasis in original). When the Court applies that test here, it is compelled to conclude that the alleged facts show or suggest that

McPeake's animosity towards Abert was personal in nature and not part of a proper employer/employee relationship.

This conclusion is supported by *Jackson,* a case actually cited by RehabCare. Although most of plaintiff's allegations involved conduct that occurred in the workplace, during business hours and was related to workplace activities, the district court in *Jackson* found, nonetheless, that her IIED claim fell within the personal animus exception because she had also alleged that she had been physically assaulted by a co-worker for allegedly preventing the co-worker from purchasing a house, thus indicating that the assault was not closely tied to any work-related activities nor did it occur in the commission of the co-worker's job duties. *Id.* at *25-*27. The district court concluded that the plaintiff had alleged sufficient facts at the pleading stage to show that her assault may have been motivated by the co-worker's personal animus against her, and therefore, held plaintiff's IIED claim was not barred by the WCA. *Id.* at *28 (footnote omitted).

In the case at bar, the allegations show or suggest that the alleged abuse and harassment perpetrated by McPeake on Abert was motivated by marital discord between them and McPeake's extramarital affair with a co-worker. Moreover, the physical attack on Abert was directed specifically towards her, and not at female co-workers generally in the same position. The harassing conduct allegedly occurred both in and outside of the workplace, and included a physical attack. Thus, assuming the facts pled to be true and giving Abert the benefit of all favorable inferences, the Court finds that Abert has met her burden at this stage of the proceedings to show or suggest that McPeake's animosity was personal in nature and not part of a proper employer/employee relationship. Accordingly, the Court finds that the WCA does not preempt Plaintiff's claim for IIED as pled in the Complaint.

In the alternative, RehabCare argues that Defendants' alleged conduct does not rise to the

level of "extreme and outrageous" conduct necessary to state a plausible claim for IIED. Plaintiff disagrees with this conclusion, as does the Court.

As our sister courts in the Eastern District have noted, although the Pennsylvania Supreme Court has not officially recognized the tort of IIED, in analyzing such claims, the supreme court "has repeatedly applied the Restatement definition to claims for intentional infliction of emotional distress." *Weinstein v. Bullick*, 827 F. Supp. 1193, 1203 (E.D. Pa. 1993); *Corbett v. Morgenstern*, 934 F. Supp. 680, 684 n. 5 (E.D. Pa. 1996) (citing *Weinstein, supra*); *Stouch v. Brothers of Order of Hermits of St. Augustine,* 836 F.Supp. 1134, 1144 (E.D. Pa. 1993) (citing *Kazatsky v. King David Memorial Park,* 527 A.2d 988, 995 (Pa. 1987), and *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.,* 431 A.2d 966, 971-72 n. 8 (Pa. 1981)). Section 46 of the Restatement provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

RESTATEMENT (SECOND) OF TORTS, §46(1) (1965). The Pennsylvania courts have distilled the Restatement definition into four elements: "(1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; (4) that distress must be severe." *Hoy,* 691 A.2d at 482 (citing *Hooten v. Pa. Coll. of Optometry*, 601 F.Supp. 1151, 1155 (E.D.Pa.1984); RESTATEMENT, §46). RehabCare challenges only the first element.

In determining whether the first element has been met, the courts generally look to the definition of extreme and outrageous conduct set forth in the Restatement:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been

> found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

RESTATEMENT, §46, cmt. d; *see also Corbett,* 934 F.Supp. at 684 (quoting *Johnson v. Caparelli*, 625 A.2d 668, 672 (Pa. Super. Ct. 1993) (citing RESTATEMENT, §46 cmt. d)). At the pleading stage, the court determines in the first instance "whether the conduct at issue can reasonably be regarded as sufficiently extreme to constitute 'outrageousness' as a matter of law." *Brownstein v. Gieda*, 649 F. Supp. 2d 368, 374 (M.D. Pa. 2009) (quoting *Smith v. Sch. Dist. of Phila*., 112 F. Supp. 2d 417, 427 (E.D. Pa. 2000)); *see also Corbett*, 934 F. Supp. at 684 (citing *Cox v. Keystone Carbon Co*., 861 F.2d 390, 395 (3d Cir. 1998); RESTATEMENT, §46 cmt. h); *Johnson,* 625 A.2d at 671-72 (citations omitted).

In the employment context, the Pennsylvania Supreme Court in *Hoy v. Angeline* observed that "'it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress.'" *Hoy v. Angelone,* 720 A.2d 745, 754 (Pa. 1998) (quoting *Cox,* 861 F.2d at 395). The supreme court found instructive the following summary of the case law regarding IIED in the area of sexual discrimination by the court of appeals:

> [A]s a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for the intentional infliction of emotional distress. As we noted in *Cox*, 861 F.2d at 395-96, 'the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee.' *See Bowersox v. P.H. Glatfelter Co*., 677 F.Supp. 307, 311 (M.D.Pa.1988). The extra factor that is generally required is

retaliation for turning down sexual propositions.

*Hoy,* 720 A.2d at 754 (quoting *Andrews v. City of Phila.,* 895 F.2d 1469, 1487 (3d Cir. 1990)).

Thus, because recovery for IIED is limited to "only the most clearly desperate and ultra extreme conduct," the supreme court concluded that "the factor of retaliation is an entirely appropriate consideration when determining the outrageousness of an employer's actions." *Id.* Nonetheless, the supreme court tempered its conclusion by holding that:

> consideration of retaliation in the context of a claim for the intentional infliction of emotional distress is one of a number of factors to be used in assessing such a claim. By regarding retaliation as a weighty factor, but not a mandated factor, we allow for the rare case in which a victim of sexual harassment is subjected to blatantly abhorrent conduct, but in which no retaliatory action is taken.

*Id.* Taking into consideration that the record in *Hoy* established sexual harassment consisting of "sexual propositions, physical contact with the back of Appellant's knee, the telling of off-color jokes and the use of profanity on a regular basis, as well as the posting of a sexually suggestive picture[,]" together with a complete lack of evidence of any retaliation, the supreme court ultimately concluded that defendants' conduct, although "highly offensive and unacceptable," did not rise to the level of extreme and outrageous conduct. *Id.* at 754-55.

By contrast here, Abert has alleged numerous acts of sexual harassment based on McPeake's personal animus towards her as his estranged wife, including assigning her to distant, inconvenient work sites, engaging in threatening conduct towards her person and reputation at work by falsely accusing her of stealing things from work and him personally, refusing to answer work related questions, falsely accusing her of deleting matters from his computer, telling co-workers that Plaintiff was "crazy," taking items from her purse, throwing papers at her, shoving a chair at her, and using foul language toward her, while openly conducting an extra-marital affair

with Greenery's Assistant Director of Nursing in and outside of their workplace. (Compl. ¶¶35, 38-39, 49, 98.) Abert further contends that she was forced to work in a hostile work environment where, because of the affair, McPeake grew openly abusive and threatening to her in the workplace in an effort to eliminate her, that this hostile environment continued unabated for a long time, Defendants took no action to improve the situation after she complained and actually condoned the hostile environment by approving his conduct to the extent that it escalated to a serious physical attack upon her. Abert has also alleged Defendants retaliated against her for complaining about McPeake's verbal and physical assaults on her. (Compl. ¶¶98-102, 106-109.)

Taking these factual allegations to be true, the Court finds Defendants' conduct could reasonably be regarded as sufficiently extreme to constitute "outrageousness" as a matter of law. *See Graudins v. Retro Fitness, LLC,* Civ. A. No. 11-6466, 2013 WL 444669, *6 (E.D.Pa. Feb. 5, 2013) (holding employees' harassment of plaintiff and supervisor's retaliation for reporting most severe instance of harassment was sufficiently outrageous for plaintiff's IIED claim against employer to proceed) (citing *Bowersox,* 677 F.Supp. at 308, 311-12); *Jackson,* 2009 U.S. Dist. LEXIS 6936, at *32 ("Violence or physical harm, or threats of violence or physical harm . . . may be sufficiently 'extreme and outrageous' to support a claim for intentional infliction of emotional distress.") (citing *Price v. Philadelphia,* 790 F.Supp. 97, 100 (E.D.Pa. 1992)) (other citation omitted). In *Jackson,* the court held that the "linchpin for the 'extreme and outrageous' element is the alleged assault of [the plaintiff,] and found that "this aggressive conduct may be sufficiently 'extreme and outrageous' to support a claim for intentional infliction of emotional distress[,]" and thus, was sufficient to withstand a motion to dismiss. *Id.* at *35-*36. So too here, the alleged physical attack on Abert, together with the allegations of harassment and retaliation, are sufficiently "extreme and outrageous" to withstand a motion to dismiss.

Accordingly, the Court recommends that Defendants' motion to dismiss Plaintiff's claim for IIED in Count V be denied.

### b.    Negligent Infliction of Emotional Distress

With regard to preemption of her claim for NIED, Abert fails to cite any authority to support her position that the negligent infliction of emotion distress claim is not preempted by the WCA.  Rather, Plaintiff cites only cases addressing the preemption of IIED claims, which are not dispositive of the preemption of NIED claims, most likely because the statutory and decisional law do not support her position.

Indeed, the language of the statute itself makes clear that the personal animus exception applies only to intentional acts by third parties, not negligent ones.  77 Pa. Stat. §411(1).  The courts interpreting Sections 481(a) and 411(1) have so concluded.  *See Galazniak v. Millville Health Ctr.,* Civ. A. No. 4:11-cv-1719, 2012 WL 140220, *2 n. 3 (M.D.Pa. Jan. 18, 2012) (noting that personal animus exception does not apply to cases of negligent infliction of emotional distress) (citations omitted); *Hettler v. Zany Brainy, Inc.*, No. Civ. A. 99-3879, 2000 WL 1468550, *6 (E.D.Pa. Sept. 27, 2000) (citing *Williams v. Claims Overload Systems, Inc*., No. Civ. A. 2:97-6851, 1998 WL 104476,*3 (E.D.Pa. Feb. 25, 1998); *Hampton v. Tokai Fin. Servs., Inc*., No. Civ. A. 98-5074, 1999 WL 83934,*2 (E.D.Pa. Feb. 18, 1999)).  *See also Cleland Simpson Co. v. Workmen's Compensation Appeal Bd.*, 332 A.2d 862, 865 (Pa. Commw. Ct. 1975) (based on the exclusionary provision in Section 411 and cases interpreting it, court concluded that some intention on the part of the assailant to inflict injury for personal reasons is required to avoid preemption by the WCA); *Rodgers v. Broadbents Spray Rentals,* 22 Pa. D & C 3d 617, 622-23 (Pa. Com. Pl. 1981) (finding Section 411(1) provides a personal animus exception only for intentional conduct and the complaint, which alleged only "gross, wanton, and

willful negligence," failed to assert intentional conduct to fall within the exception).  Thus, the Court finds Plaintiff's claim for NIED is preempted by the WCA.  Therefore, the Court recommends that Defendants' motions to dismiss Plaintiff's claim for negligent infliction of emotional distress in Count VI be granted with prejudice.

5.     **Count VIII – Wrongful Discharge in Violation of Public Policy**

RehabCare seeks to dismiss Plaintiff's claim for wrongful discharge in violation of public policy in Count VIII on two grounds: (1) the wrongful discharge claim is preempted by the Crime Victims Employment Protection Act, and (2) there is no authority in Pennsylvania for recognizing a public policy exception to the at-will employment doctrine for filing petitions under the Protection from Abuse Act.  Because the Court finds merit to RehabCare's first argument, it does not reach the second one.

RehabCare submits that the Crime Victims Employment Protection Act preempts Plaintiff's claim for wrongful discharge in violation of public policy.  The Pennsylvania Supreme Court has not yet ruled on this precise issue.  Therefore, this Court must predict how the Pennsylvania Supreme Court would rule if faced with this question.  *Covington v. Cont'l Gen. Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004) (citing *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1046 (3d Cir.1993)).  In so doing, the Court "'must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.' The decision of an intermediate state court is particularly relevant and 'is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Covington,* 381 F.3d at 218 (quoting *Packard,* 994 F.2d at 1046; *Comm'r v. Bosch's Estate*, 387 U.S. 456, 465, (1967)).

Pennsylvania is an at-will employment state, meaning that an employer "may discharge an employee with or without cause at pleasure, unless restrained by some contract." *Henry v. Pittsburgh & Lake Erie R.R. Co.*, 139 Pa. 289, 297, 21 A. 157 (1891). Thus, in the absence of a contractual or statutory provision to the contrary, generally, no common law cause of action exists for the discharge of an at-will employee. *Geary v. U.S. Steel Corp.,* 319 A.2d 174, 175 (Pa. 1974). Exceptions to this rule have been recognized, but only in the most limited of circumstances where discharges of at-will employees would threaten clear mandates of public policy. *Rothrock v. Rothrock Motor Sales, Inc.,* 883 A.2d 511, 515 (Pa. 2005); *Shick v. Shirey*, 716 A.2d 1231, 1233 (Pa. 1998).

In support of its preemption argument, RehabCare cites *Palazzolo v. Damsker* for the proposition that "Pennsylvania law does not recognize a common law cause of action for violating public policy when there is an existing statutory remedy." *Palazzolo v. Damsker,* No. 10-CV-7430, 2011 WL 2601536, at *7 (E.D.Pa. June 30, 2011) (citing *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 941 (3d Cir. 2003) (affirming dismissal of public policy wrongful termination claim where statutory remedy was available under the Fair Labor Standards Act); *Wolk v. Saks Fifth Avenue, Inc.*, 728 F.2d 221, 224 n. 3 (3rd Cir.1984) (no common law tort action was available to plaintiff where she had a statutory remedy under the PHRA); *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 919-20 (3d. Cir.1982) (Pennsylvania would not recognize a wrongful discharge claim based on handicap or disability where statutory remedy existed under PHRA); *Jacques v. AKZO Int'l Salt., Inc.*, 619 A.2d 748,753 (Pa. Super Ct.1993) (citing *Clay v. Advanced Computer Applications*, 559 A.2d 917, 918 (Pa.1989)), *abrogated on other grounds as recognized in Kroptavich v. Pa. Power & Light Co.*, 795 A.2d 1048, 1055 (Pa. Super. Ct. 2002)). In *Palazzolo*, the district court granted a motion to dismiss

based on its determination that because the plaintiff possessed an appropriate statutory remedy under the Pennsylvania Whistleblower Law, she could not also allege a wrongful discharge claim. *Id.*

In reaching this conclusion, the district court in *Palazzolo* also relied on several decisions of the Pennsylvania appellate courts. For example, in *Jacques*, the Pennsylvania Superior Court opined that "[i]t is well-settled that the courts will not entertain a separate common law action for wrongful discharge where specific statutory remedies are available." 619 A.2d at 753 (citing *Clay,* 559 A.2d at 918 (citing *Householder v. Kensington Mfg. Co*., 520 A.2d 461 (Pa. Super. Ct. 1987))). The superior court upheld the dismissal of a wrongful discharge claim where the plaintiff alleged that an act of age discrimination deprived him of his pension rights in violation of public policy, finding the PHRA preempted plaintiff's wrongful discharge claim. *Id.*

In *Bruffett,* the court of appeals noted that the Pennsylvania appellate courts have only applied the public policy exception where statutory remedies were not available. 692 F.2d at 919. For example, in *Reuther v. Fowler & Williams, Inc.,* 386 A.2d 119 (Pa. Super. Ct. 1978), the court of appeals noted that the superior court recognized a common law wrongful discharge claim where the employee was allegedly discharged for taking time off to serve jury duty, and in *Hunter v. Port Authority of Allegheny Cty.,* 419 A.2d 631 (Pa. Super. Ct. 1980), the superior court held that a job applicant who was refused employment because of a pardoned conviction in violation of the state constitution stated a claim for relief. In addition, applying Pennsylvania law in *Perks v. Firestone Tire & Rubber Co.,* the court of appeals noted that it had held that Pennsylvania's anti-polygraph statute did not create a statutory remedy and thus did not preclude a claim for wrongful discharge where the statute "embodied 'a recognized facet of public

policy.'"  *Bruffett*, 692 F.2d at 919 (citing *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363, 1366 (3d Cir. 1979)).

Thus, the great weight of authority supports the conclusion that Abert's claim for wrongful discharge in violation of public policy should be dismissed since she possesses a statutory remedy under the Crime Victims Employment Protection Act, and indeed, has availed herself of such remedy.  Moreover, a review of the allegations in the Complaint shows that Abert's claim of wrongful discharge in violation of public policy derives from the same key facts as those alleged in support of her claim under the Crime Victims Employment Protection Act. *Compare* Compl. ¶¶ 112-120, *with* Compl. ¶¶141-146.  In particular, Abert alleges that she was a victim of a crime, was required to attend court to obtain a PFA order, she was terminated for exercising her right to attend court and to obtain a PFA order, and as such, her termination clearly violated public policy of Pennsylvania to protect victims of domestic abuse.  Thus, in essence, like the plaintiff in *Preobrazhenskaya*, Abert is asserting the same claim under different theories of recovery, and her wrongful discharge claim fails for the same reason—it is precluded by the availability of a statutory remedy, here the Crime Victims Employment Protection Act.

In opposing dismissal of Count VIII, Plaintiff contends that the Crime Victims Employment Protection Act was not drafted to specifically protect victims of domestic abuse and does not provide a full remedy as a common law claim of wrongful discharge would.  "If the goal of the legislature is to prevent future domestic violence as the courts have found, then a victim must be able to file for relief and if she is terminated for seeking such relief, she should have the full remedy of wrongful discharge available . . .."  (Pl.'s Mem. in Opp'n at 33, ECF No. 35.)  This argument is unavailing.  As Plaintiff observes, the Crime Victims Employment Protection Act does not permit recovery of damages for emotional distress or punitive damages,

but limits a victim's remedies to wages and benefits lost as a result of the violation, an order requiring the reinstatement of the employee, and a "reasonable attorney fee fixed by the court." 18 PA. CONS. STAT. ANN. § 4957(c). Although the Crime Victims Employment Protection Act does not afford Abert with the full panoply of potential remedies that a claim for wrongful discharge would afford, the Pennsylvania legislature deemed the remedies provided under the Crime Victims Employment Protection Act to be sufficient, and it is not for this Court to say otherwise. Moreover, the existence, not the success, of a statutory claim determines whether it preempts the common law remedy. *Jacques,* 619 A.2d at 753 (citing *Keck v. Commercial Credit Union Ins. Co.*, 758 F.Supp. 1034 (M.D.Pa. 1991)); *Palazzolo,* 2011 WL 2601536, at * 7 (citing *DeMuro v. Phila. Housing* Authority, No. 98-3137, 1998 WL 962103 (E.D.Pa. Dec. 22, 1998)).

Plaintiff further submits that she should be able to avail herself of the common law remedy of wrongful discharge based on the provision in the Protection from Abuse Act that states that victims of abuse are not limited to the remedies in the PFA Act. 23 PA. CONS. STAT. ANN. §6117(a). Although Plaintiff is correct that the PFA Act contains explicit language indicating the remedies under that Act are not exclusive,[27] she is only entitled to seek remedies that are otherwise available. Plaintiff has indeed sought another remedy under the Crime Victims Employment Protection Act, and this Court determined above that the Complaint states a plausible claim for a violation of the Crime Victims Employment Protection Act, which redresses loss of employment due to attendance in court as a victim of a crime. Therefore, a statutory remedy exists to redress her suspension and subsequent termination allegedly due to her

---

[27] Section 6117 provides, in pertinent part: "Unless otherwise indicated in this chapter, a proceeding under this chapter shall be in accordance with applicable general rules and shall be in addition to any other available civil or criminal remedies." 23 PA. CONS. STAT. ANN. §6117(a).

attendance at a court proceeding to obtain a PFA order. Because a statutory remedy exists under the Crime Victims Employment Protection Act, the Court has concluded that the Pennsylvania Supreme Court likely would not recognize a common law claim for wrongful discharge in violation of public policy based on the facts asserted here. As such, a common law wrongful discharge claim is not an "available" civil remedy to which Section 6117(a) refers.[28]

Accordingly, the Court finds as a matter of law that Plaintiff's cause of action for wrongful termination in violation of public policy is preempted by the Crime Victims Employment Protection Act. Therefore, the Court recommends that RehabCare's Motion to Dismiss Count VIII be granted with prejudice.

### D. CONCLUSION

For the reasons set forth above, it is respectfully recommended that the motions to dismiss filed by Defendants Greenery and Fundamental (ECF No. 20) and Defendant RehabCare (ECF No. 28) be granted with prejudice as to Plaintiff's claims for constructive discharge in Count I, hostile work environment (Count II), and retaliation (Count III).

It is further recommended that the motions to dismiss filed by Defendants Greenery and Fundamental (ECF No. 20) and Defendant RehabCare (ECF No. 28) be granted without prejudice as to Plaintiff's claim for failure to rehire in Count I, so long as Plaintiff elects to file a motion for leave to amend her Complaint as to the failure to rehire claim within 14 days of the district court's order regarding this Report and Recommendation. Should Plaintiff elect to rest

---

[28] Plaintiff mainly side steps RehabCare's preemption argument and instead focuses almost exclusively on whether her discharge for attending a court proceeding to obtain a PFA order violates a clear public policy of Pennsylvania. Although the Court finds merit to Plaintiff's public policy argument, it does not reach that novel question because the Court finds that the Crime Victims Employment Protection Act preempts her common law wrongful discharge claim.

on the allegations in her original Complaint, then the Court recommends that the motions to dismiss the failure to rehire claim in Count I be dismissed with prejudice.

It is further recommended that the motion to dismiss filed by Defendant RehabCare (ECF No. 28) be denied as to Plaintiff's claim for violation of the Crime Victims Employment Protection Act (Count VI).

It is further recommended that the motions to dismiss filed by Defendants Greenery and Fundamental (ECF No. 20) and Defendant RehabCare (ECF No. 28) be denied as to Plaintiff's claim for intentional infliction of emotional distress (Count V), and granted with prejudice as to Plaintiff's claim for negligent infliction of emotional distress (Count VI).

It is further recommended that the motion to dismiss filed by Defendant RehabCare (ECF No. 28) be granted with prejudice as to Plaintiff's claim for wrongful discharge in violation of public policy (Count VIII).

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: February 22, 2013

BY THE COURT:

LISA PUPO LENIHAN
Chief U.S. Magistrate Judge

cc:     All Counsel of Record
        *Via Electronic Mail*